UNITED STATES of America, Plaintiff,

v.

Robert J. CARLSON, Defendant.

No. 82–1200.

United States Court of Appeals,
Eighth Circuit.

Submitted June 18, 1982.

Decided Jan. 5, 1983.

Meshbesher, Singer & Spence, Ltd., Ronald I. Meshbesher, Cheryl Divine, Minneapolis, Minn., for appellant.

James M. Rosenbaum, U.S. Atty., Janice M. Symchych, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., David Soucy, Legal Intern, for appellee.

Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Robert J. Carlson appeals from his conviction for mail fraud under 18 U.S.C. § 1341, contending that the district court[1] improperly denied his pretrial motions to dismiss the indictment and to suppress evidence. Carlson argues that the mail fraud indictment should have been dismissed because the government delayed presenting the charges to the grand jury in violation of his speedy trial rights. Carlson further contends that his Fourth Amendment rights were violated. We affirm.

---

[1]. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

On September 15, 1976, defendant Carlson and his friend Paul Scherber reported to the Mound, Minnesota Police Department that a number of video games belonging to Carlson had been stolen from Scherber's residence. Carlson reported the loss to his insurance company, Aetna Casualty and Surety Company, and in February 1977 Aetna paid Carlson a total of $40,000 in satisfaction of his claim for the loss of the video machines. It was stipulated that defendant Carlson and an accomplice had themselves removed the machines from Scherber's garage and had created the appearance of a burglary in order to defraud Carlson's insurance company.

In mid-January 1980 Officer Olson of the Minnetonka Police Department received an anonymous call stating that four of the video games which Carlson had reported stolen in 1976 had been delivered to Carlson's residence on January 15, 1980, and that five more would be delivered to defendant at his residence at approximately 7:00 a.m. on January 18, 1980. Inspector Olson communicated this information to Officer Bostrom and Detective Coudron. Detectives Coudron and Peterson of the Minnetonka Police Department set up surveillance of defendant Carlson's house at approximately 6:00 a.m. on January 18, 1980. A few minutes before 7:00 they observed a white van pull up and saw an unidentified man unload five boxes onto the sidewalk near defendant's house. They observed the man ring the door bell and then leave immediately. The boxes were of the size that could hold video games. At a little after 7:00 a man matching Robert Carlson's description came out of the house, moved the five boxes into the garage and closed the garage door.

At around 8:40 a.m. the police observed a large amount of smoke coming from the chimney of defendant Carlson's house. They contacted the Hennepin County Attorney's office believing that evidence was being burned, and were advised by the county attorney to "seize" the house and await the issuance of a warrant before searching it. The police then telephoned Sergeant Hudson of the Mound Police Department and requested that he apply for a search warrant.

The police officers approached defendant's house, and as they were walking toward the front door they observed through an unobstructed window that there were cut up pieces of video games lying on the floor in the den of Carlson's house, and they saw other pieces of the video games burning in the fireplace. They knocked on the door of defendant's house and identified themselves, but received no response. In order to prevent the further destruction of evidence they then forcibly entered defendant's house and put out the fire. They made a security sweep of the house and found defendant Carlson in an upstairs bathroom. They arrested him, brought him downstairs and waited for the search warrant to arrive. At 10:00 a.m. they obtained the warrant and thereafter conducted a search of defendant's house, seizing a number of the video games which defendant had reported stolen in 1976.

Defendant Carlson was taken to the Hennepin County Jail but was released a few hours later. Carlson appeared in Hennepin County District Court on January 23, 1980, at which time he learned that no complaint or charges had been filed. No state criminal charges have ever been brought against Carlson as a result of the January 18, 1980 arrest.

Federal authorities learned of Carlson's arrest shortly after it occurred. On March 7, 1980, they decided to investigate the case for possible mail fraud. The case was transferred among several postal inspectors until May 1980, when it was assigned to Harry Shields. Shields continued to investigate the case through June 1981. On July 10, 1981, an indictment for mail fraud was returned against defendant pursuant to 18 U.S.C. § 1341.

On July 16, 1981, defendant appeared before Magistrate Floyd E. Boline and entered a plea of not guilty. Magistrate Boline heard defendant's pretrial motions on August 11 and 12, 1981. On the recommendation of Magistrate Boline, Judge Murphy

denied appellant's motions to suppress evidence and to dismiss the indictment. After a trial to the court based on stipulated facts, Judge Murphy found defendant guilty of mail fraud and sentenced him to a one-year jail term.

## I. SPEEDY TRIAL

### A. *Speedy Trial Act*

 Carlson first contends that the eighteen-month delay between his January 18, 1980, arrest by state officials and his July 10, 1981, indictment on Federal mail fraud charges violates the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.* We reject defendant's argument and join the Second, Fourth and Fifth Circuits in holding that a state arrest does not activate the time limits of the Speedy Trial Act.

In the recent case of *United States v. Iaquinta,* 674 F.2d 260, 264 (4th Cir.1982), the Fourth Circuit reviewed the cases dealing with the state arrest issue and concluded:

> The Speedy Trial Act is intended to mandate an orderly and expeditious procedure for federal criminal prosecutions by fixing specific, mechanical time limits within which the various progressions in the prosecution must occur.... Since the Act applies only to federal prosecutions it is only a *federal* arrest, not a state arrest, which will trigger the commencement of the time limits set in the Act. In so providing, the Act is consistent with "the doctrine of dual sovereignty, which recognizes that 'the federal government is not bound by the actions of state authorities and that successive state and federal prosecutions are constitutionally permissible.'" [Quoting from *United States v. Wilson,* 657 F.2d 755, 767 (5th Cir.1981)]

*Accord: United States v. Mejias,* 552 F.2d 435 (2d Cir.) *cert. denied* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *U.S. v. Phillips,* 569 F.2d 1315 (5th Cir.1978); *United States v. Lai Ming Tanu,* 589 F.2d 82 (2d Cir.1978); *United States v. Rivera,* 465 F.Supp. 402, (S.D.N.Y.) *aff'd without opin-ion sub nom., United States v. Ramirez,* 614 F.2d 1292 (2d Cir.1979); *United States v. Leonard,* 639 F.2d 101 (2d Cir.1981).

Even if we were to rule that a state arrest could activate the time provisions of the Speedy Trial Act, however, the particular arrest at issue here would not have been sufficient to do so. In *United States v. Jones,* 676 F.2d 327 (8th Cir.1982), we held that 18 U.S.C. § 3161 applied only when an arrested individual has been charged with an offense. It is undisputed that defendant was not charged with any offense after his January 18, 1980 arrest. Under the reasoning of *Jones* this arrest therefore would not have set in motion the time limits of the Speedy Trial Act. *See also: United States v. Solomon,* 679 F.2d 1246 (8th Cir.1982); *United States v. Boles,* 684 F.2d 534 (8th Cir.1982).

### B. *Sixth Amendment*

 Carlson next contends that his Sixth Amendment speedy trial rights have been violated. We reject this argument since the delay defendant complains of occurred in the "pre-accusation" stage of the proceedings. "[T]he protection of the [Sixth] Amendment is activated only when a criminal prosecution has begun and extends only to those persons who have been 'accused' in the course of that prosecution." *United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468, 474 (1971). Defendant's Sixth Amendment speedy trial rights can be triggered by an arrest as well as by an indictment. *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975). As the Supreme Court made clear in *United States v. MacDonald,* 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982), however, it is not the arrest itself, but rather the criminal charges arising out of the arrest which activate Sixth Amendment protection. *See also: United States v. Jones, supra; United States v. Solomon, supra; United States v. Boles, supra.* In this case defendant was incarcerated for only a few hours following his arrest, and

no state charges were brought against him.[2] We conclude that defendant's Sixth Amendment speedy trial rights were not activated by the delay between his January 1980 state arrest and his July 1981 federal indictment.

Even if we were to accept defendant's argument that his January 1980 arrest automatically triggered Sixth Amendment protection, we would find that defendant had not been deprived of his right to a speedy trial. We have reviewed the record in light of the standards set out in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) and conclude that no Sixth Amendment speedy trial violation occurred.

### C. *Fifth Amendment*

 Defendant also argues that the government's preindictment delay violated his Fifth Amendment due process rights.[3] In order to establish a due process violation sufficient to warrant dismissal defendant must show both that the government deliberately delayed in order to gain a tactical advantage and that the delay prejudiced him in presenting his case. *United States v. Dennis,* 625 F.2d 782, 794 (8th Cir.1980). The record reflects that federal authorities began their formal mail fraud investigation in March 1980. In May 1980 the case was transferred to Inspector Harry Shields, who continued to investigate it through June 1981, only a month before the return of the indictment. There was no evidence that the government delayed in order to gain a tactical advantage. Further, defendant has put forth only generalized allegations of prejudice without demonstrating any specific instances of harm in presenting his defense. We conclude that defendant's

Fifth Amendment argument is without merit.

### D. *Rule 48(b)*

 Carlson also asserts that the trial court improperly refused to dismiss his indictment for want of prosecution pursuant to Rule 48(b), Fed.R.Crim.P. Dismissal under this rule is discretionary with the trial court and is governed by the same general considerations as the Sixth Amendment. *United States v. Crow Dog,* 532 F.2d 1182, 1194 (8th Cir.1976) *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977). Having found no Sixth Amendment violation, we conclude that the trial court's refusal to dismiss under Rule 48(b) did not constitute an abuse of discretion.

## II. FOURTH AMENDMENT

### A. *Validity of the Search Warrant*

Defendant next challenges the validity of the search warrant issued by the state magistrate in connection with the January 1980 search of his house. The warrant was issued on the basis of information contained in an affidavit signed by Sergeant William M. Hudson of the Mound, Minnesota Police Department. The affidavit recited the following information: In September 1976 defendant Carlson and his friend Paul Scherber had reported the theft of a number of video game machines belonging to Mr. Carlson. In February 1977 defendant Carlson had received an insurance payment of $40,-000 to reimburse him for the loss of the video games. On January 16, 1980, Officer Bostrom received an anonymous phone call stating that four of the video pong games which had been reported stolen in 1976 had

**2.** The only restraint on defendant's liberty was a "probable cause" bond imposed by state authorities which restrained defendant from leaving the state of Minnesota. Defendant did not attempt to have this bond lifted.

**3.** The most substantial pre-indictment delay alleged by defendant was the approximately three and one-half year time lapse between the report of the theft of the video games in September 1976 and the state arrest in January 1980. It is undisputed, however, that neither

state nor federal authorities were aware of any criminal wrongdoing on the part of defendant until January 1980, and thus would have had no cause to investigate or criminally prosecute him before that time. We thus find that the defendant's assertion of prejudice from this three and one-half year "delay" is without merit, and focus our attention solely on the period between his state arrest in January 1980 and his federal indictment in July 1981.

been delivered to defendant Carlson's residence on January 15, 1980, and that five more would be delivered on January 18, 1980. On January 17, 1980, Detective Walter Coudron of the Minnetonka Police Department received an anonymous call that five electronic video games and a ten speed bike would be delivered to defendant Carlson at his residence in Minnetonka at approximately 7:00 a.m. on January 18, 1980.[4] Detectives Coudron and Peterson of the Minnetonka Police Department set up surveillance of defendant Carlson's house at approximately 6:00 a.m. on January 18, 1980. At 6:52 a.m. they observed a white van pull up to the residence and saw an unidentified man unload five boxes onto a sidewalk near the house, ring the door bell and then leave immediately. The boxes dropped off were of the type that could hold objects the size of video games. At 7:08 a.m. a white male matching the description of Robert Carlson came out of the house, moved the five boxes into the garage and closed the garage door. At 8:40 a.m. Inspector Olson of the Minnetonka Police Department observed a large amount of smoke coming from the chimney of defendant Carlson's house. Inspector Olson called the County Attorney's office believing that evidence was being destroyed, and was advised to "seize" the house and await the issuance of a warrant before searching the premises.

Defendant argues that the search conducted pursuant to the warrant issued on this affidavit, in which a number of video games were seized, was illegal, and that the seized evidence should have been suppressed.

■ Defendant argues that the affidavit was insufficient to establish probable cause because it did not recite the basis on which the anonymous informants obtained their information and did not establish either the credibility of the informants or the reliability of their information. In assessing the adequacy of the affidavit we must

follow the guidelines set out in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). *Aguilar* held that an affidavit based on an undisclosed informant's tip could be adequate to establish probable cause for a search warrant provided that the affidavit showed (1) some of the underlying circumstances from which the informant drew his conclusions, and (2) some of the underlying circumstances establishing that the informant was credible or his information reliable. In the later case of *Spinelli,* the Supreme Court explained that, even when an affidavit did not meet the strict *Aguilar* test, it could still be adequate if it were sufficiently detailed, or sufficiently corroborated, to supply the trustworthiness which *Aguilar* sought to establish. *See also: United States v. Smith,* 635 F.2d 1329, 1333–34 (8th Cir.1980); *United States v. Marihart,* 472 F.2d 809, 813 (8th Cir.1972). The basic requirement of *Spinelli* is that a magistrate must be able to determine from the affidavit that "he is relying on something more substantial than a casual rumor circulating in the underworld." 393 U.S. at 416, 89 S.Ct. at 589, 21 L.Ed.2d at 644.

■ In determining whether the affidavit was sufficient we must keep in mind that courts "evince a strong preference for searches made pursuant to warrant, and, in some instances, may sustain them where warrantless searches based on a police officer's evaluation of probable cause might fail." *United States v. Brown,* 584 F.2d 252, 256 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979). In view of this standard, "reviewing courts should interpret affidavits for search warrants in a commonsense and realistic fashion, and deference is to be accorded an issuing magistrate's determination of probable cause." *United States v. Leichtling,* 684 F.2d 553, 555 (8th Cir.1982).

---

4. The government concedes that this statement was incorrect. Only one anonymous tip was received by Inspector Olson of the Minnetonka

Police Department, who communicated it to Detective Coudron and Officer Bostrom.

██ Defendant contends that many of the facts recited in the affidavit reflect activities which would not alone give rise to an inference of criminal activity. However, we have previously stated that observation of apparently innocent acts "can be significant to a trained officer" and that the officer is "entitled to assess probable cause in light of his experience." *United States v. Wentz*, 686 F.2d 653, 656 (8th Cir.1982). In addition, "[i]t is settled in this circuit that when an application for a warrant is being considered, the issuing magistrate may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." *United States v. Leichtling*, 684 F.2d at 556.

██ In this case the anonymous phone call stating that defendant would receive the five video machine games at his home at a certain hour on January 18, 1980, when fully corroborated by the observations of the police, was sufficient to establish probable cause for issuance of a warrant.

██ Defendant also argues that various omissions and factual misrepresentations in the affidavit render the search warrant invalid. The most serious misrepresentation argued by defendant is the admittedly incorrect statement that Detective Coudron and Officer Bostrom received anonymous tips, when in fact Inspector Olson was the party who received the information. A misrepresentation made in an affidavit submitted in application for a search warrant will not invalidate the warrant unless the misrepresentation was made recklessly or intentionally. *United States v. Lyon*, 567 F.2d 777, 782 (8th Cir.1977), *cert. denied*, 435 U.S. 918, 98 S.Ct. 1476, 55 L.Ed.2d 510 (1978); *United States v. Ventling*, 678 F.2d 63 (8th Cir.1982). In this case there is no indication that the misstatement regarding the tip was anything other than an unintentional mistake on the part of the officer applying for the warrant, and it therefore will not render the warrant invalid. We have reviewed defendant's other allegations regarding minor errors and omissions in the affidavit and find them equally without merit.

### B. *Warrantless Entry & Arrest*

██ Defendant finally argues that his Fourth Amendment rights were violated by the officers' entering his house and arresting him before the search warrant arrived. Since this was a warrantless entry, it must be shown that the entry was made pursuant to one of the recognized exceptions to the warrant requirement. *United States v. Selberg*, 630 F.2d 1292, 1294 (8th Cir.1980).

██ At the time the police officers left their position of surveillance and approached the front door of defendant's house they believed that evidence was being destroyed. They had observed defendant take the five boxes into the garage and later saw large amounts of smoke coming from his chimney. Although their approaching defendant's house may have violated an area in which he had a reasonable expectation of privacy, their so doing was justified under the circumstances. *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir.1977). Their glimpsing pieces of the video games lying on the floor and burning in the fireplace were inadvertent, "plain view" observations which corroborated their belief that evidence was being destroyed. At this point they were justified in taking action to prevent the removal or destruction of evidence. *United States v. Kulcsar*, 586 F.2d 1283, 1287 (8th Cir.1978). We conclude that the government's warrantless entry was justified by exigent circumstances, and that there was probable cause for the subsequent arrest of defendant based on the facts and circumstances within the knowledge of the police at the time the arrest was made. *United States v. Neumann*, 585 F.2d 355 (8th Cir.1978).

██ Defendant makes the additional contention that the police conducted an illegal search of his house before the search warrant arrived. Magistrate Boline concluded that the police had made only a security sweep through defendant's house, and that they had conducted no search and seized no evidence until after the warrant

arrived. The district court reviewed Magistrate Boline's recommendations and agreed that defendant's motion to suppress should be denied. There was conflicting testimony at the suppression hearing as to whether a search had been made, and the court was entitled to find the testimony of the police on this issue more credible than that of defendant. "[T]he decision of the trial court concerning a motion to suppress will be upheld where it can be supported by any reasonable view of the evidence." *United States v. Valle,* 644 F.2d 374, (8th Cir.1981). We conclude that the finding that no search took place prior to the arrival of the warrant is amply supported.

Affirmed.