UNITED STATES of America, Appellee,

v.

Ed UDEY, Appellant.

UNITED STATES of America, Appellee,

v.

Arthur H. RUSSELL, Appellant.

UNITED STATES of America, Appellee,

v.

Leonard G. GINTER, Appellant.

UNITED STATES of America, Appellee,

v.

Norma GINTER, Appellant.

Nos. 83–2615, 83–2632, 83–2654, 83–2655.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1984.

Decided Nov. 7, 1984.

Rehearing Denied in Nos. 83–2654, 83–2655 Dec. 28, 1984.

Rehearing En Banc Denied in Nos. 83–2615, 83–2632 Dec. 28, 1984.

Lay, Chief Judge, concurred in part and dissented in part and filed opinion.

Lay, Chief Judge, Heaney, Bright and McMillian, Circuit Judges, dissented from denial of rehearing and filed opinion.

Charles Karr, Fort Smith, Ark., Joe A. Izen, Houston, Tex., and Michael L. Minns, Katy, Tex., for appellant.

Larry R. McCord, Asst. U.S. Atty., Fort Smith, Ark., for appellee.

Before LAY, Chief Judge, ROSS and FAGG, Circuit Judges.

ROSS, Circuit Judge.

The appellants, Edwin C. Udey, Arthur H. Russell, Leonard Ginter, and Norma Ginter, were indicted for conspiring to harbor and conceal a fugitive, and for the substantive offense of harboring and concealing a fugitive. They were tried by a jury and convicted on each count. The district court[1] sentenced Udey to five years imprisonment on each count with the sentences to run concurrently. Russell was sentenced to five years on each count, but the period of actual incarceration was to be six months followed by four years probation in lieu of the remainder of the term which was suspended. Leonard Ginter received a sentence of five years on each count with the sentences to run concurrently. Norma Ginter was sentenced to five years on each count, but the sentence was suspended and a five year probation term was imposed instead. The defendants appeal their convictions under 28 U.S.C. § 1291 (West Supp.1984). For the reasons stated herein we affirm the convictions.

## I. FACTS

On February 13, 1983, a shootout occurred in Medina, North Dakota, which resulted in the death of two United States Marshals.[2] The following day a magistrate

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court, Western District of Missouri.

2. The details of the Medina shootout, and the events leading to the search for Gordon Kahl are discussed at length in *United States v. Faul,* 748 F.2d 1204 (8th Cir. 1984).

issued a warrant for the arrest of Gordon W. Kahl for the murders of the two marshals. Thereafter, on March 11, 1983, another warrant for Kahl's arrest was issued based upon a federal grand jury's indictment charging Kahl with murder. A nationwide manhunt for Kahl ensued, leading law enforcement authorities to the Ginters' residence near Smithville, Arkansas, where another shootout occurred in which Gordon Kahl and a local law enforcement officer were killed.

The evidence at trial—elicited largely from Karen Robertson, Arthur Russell's daughter—established that on March 13, 1983, Leonard Ginter was introduced to Karen Robertson at Russell's home in Mountain Home, Arkansas. The same day Gordon Kahl moved into the Russell residence where he continued to reside until May 30, 1983. During this period Kahl discussed the North Dakota incident with Russell and Robertson, and they watched television news accounts of the search for Kahl.

Udey visited the Russell residence during this period, and on his first visit he referred to Kahl as a hero. Thereafter Kahl visited Udey's residence at least twice. Udey initiated at least one of the visits by inviting Kahl to dinner.

In mid-May 1983, the Ginters visited Russell's residence. Leonard Ginter had an FBI wanted poster of Kahl, which was discussed with Kahl. On May 30, 1983, another discussion with Kahl took place at the Russell residence, where the Ginters, Russell, and Udey were present, regarding the FBI search. Later that day Gordon Kahl moved to the Ginters' residence near Smithville, Arkansas, as the group believed the FBI to be "closing in" on Kahl.

On June 3, 1983, law enforcement authorities went to the Ginter residence in search of Kahl, and a shootout occurred. The Ginters' home was burned down during the shootout. Afterwards, the remains of a mini-14 rifle similar to one that Kahl had at the Russell residence was recovered. Also recovered in a similar condition, was a shotgun belonging to the United States

Marshals' office in North Dakota, which was lost in the February 13, Medina shootout. The body of a man burned beyond recognition was also discovered; it was later identified by the Medical Examiner as Gordon Kahl.

## II. ISSUES

The appellants raise several issues on appeal. They are: 1) whether the district court erred in denying Udey's and Russell's motions for acquittal; 2) whether the convictions constitute double jeopardy; 3) whether the district court erred in denying the motions to suppress evidence; 4) whether the district court erred in denying admission of the defendants' expert's testimony; 5) whether the district court erred in not appointing the Ginters the counsel of their choice; 6) whether the district court erred in refusing to admit statements made by the Ginters to the police; and 7) whether Udey's sentence was too harsh.

## III. DISCUSSION

### A. Motions for Acquittal

Russell and Udey allege that the trial court erred in denying their motions for acquittal. Udey claims the evidence failed to show that he had knowledge of the warrant for Kahl's arrest. Russell claims that the evidence failed to establish an act by him of concealing Kahl.

In *United States v. Jackson*, 680 F.2d 561 (8th Cir.1982), we stated:

When reviewing a denial of a motion for acquittal we examine the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences that may logically be drawn from the evidence. We will reverse only if a reasonable jury could not have found beyond a reasonable doubt that the elements of the crime existed.

*Id.* at 563 (citations omitted). *See United States v. Michaels*, 726 F.2d 1307, 1311 (8th Cir.1984).

In order to prove the violations of 18 U.S.C. § 1071 charged in Counts II and III of the indictment, the government had to establish that: (1) the defendants knew

that a federal warrant had been issued for Kahl's arrest; (2) the defendants harbored or concealed Kahl; and (3) the defendants intended to prevent Kahl's discovery and arrest. *See United States v. Hash,* 688 F.2d 49, 52 (8th Cir.1982); *United States v. Bissonette,* 586 F.2d 73, 77 (8th Cir.1978). Knowledge of the existence of the warrant is an equally essential element of conspiring to harbor or conceal in violation of 18 U.S.C. § 371, as charged in Count I of the indictment. *See United States v. Hogg,* 670 F.2d 1358, 1361 (4th Cir.1982). Direct proof of knowledge of the existence of a warrant is rarely available. Rather, the knowledge element can be established by evidence from which the jury can properly infer knowledge and guilt beyond a reasonable doubt. *See Bissonette, supra,* 586 F.2d at 77. Additionally, in order to prove a violation of 18 U.S.C. § 371, the government had to prove: (1) the defendants entered into an agreement; (2) the agreement had as its objective a violation of the law, and (3) that one of those in agreement committed an act in furtherance of the objective. *Michaels, supra,* 726 F.2d at 1310–11. Once the existence of the conspiracy is established, "even slight evidence connecting a particular defendant to the conspiracy may be substantial and therefore sufficient proof of the defendant's involvement in the scheme." *Id.* at 1311 (citations omitted).

■ Russell claims that the evidence was insufficient to support his conviction because it did not establish that he concealed Gordon Kahl. In this case the evidence overwhelmingly established that Russell knew a federal warrant had been issued for Kahl's arrest. The testimony showed that he had discussed the FBI wanted posters with Kahl and others. With the knowledge of the outstanding warrants, Russell allowed Kahl to stay in his home thereby concealing Kahl from the law enforcement agencies·that sought his arrest. He instructed his daughter, who eventually turned Kahl in, to remain silent about the fugitive's presence and identity. On these facts we believe the jury could reasonably have inferred Russell's intention to prevent Kahl's discovery. Accordingly, his motion for acquittal was correctly denied.

Udey claims that the evidence failed to establish that he had knowledge of the existence of the warrant for Kahl's arrest. The appellant concedes that the evidence established that he met Gordon Kahl at Russell's home, referred to him by his alias name "Curly," and called him a hero. The evidence also established that Kahl visited Udey's home on at least two occasions. Nonetheless, Udey argues that the evidence failed to show that he knew Kahl's true identity, or that a warrant was outstanding for his arrest. The appellant alleges that the evidence was so scant that it allowed the jury merely to speculate, and that the jury must have had a reasonable doubt as to his guilt. *See United States v. Frol,* 518 F.2d 1134, 1137 (8th Cir.1975).

■ While the evidence with regard to Udey's guilt was not overwhelming, neither was it merely speculative. At a minimum it was sufficient to allow the issue to be presented to the jury which could properly have inferred "knowledge and guilt beyond a reasonable doubt." *Bissonette, supra,* 586 F.2d at 77. In addition to the circumstantial evidence discussed above, Karen Robertson testified that Mr. Udey was present during a May 30th discussion pertaining to the FBI closing in on Kahl; she specifically recalled seeing Udey's car.

Q. Let's move on into May 30th, Memorial Day of this year, which you testified was the day Gordon Kahl left the residence. Do you recall that day?

A. Yes, Sir.

Q. Would you describe to the jury the facts and circumstances of his departure, his leaving your house?

A. I had some stuff in the back of my pickup that I needed to unload and Mr. Ginter and Ed Udey were at the house and I went to get gas and unload the pickup. And when I was leaving, they all went into the motor home to talk.

Q. Now, when you say, "they all went in the motor home to talk," name the people you're talking about, please.

A. Mr. Kahl and Mr. Ginter and, I believe, Mr. Udey also.

Q. Okay. Were there any vehicles there at your residence that did not belong either to you or your father?

A. Yes, sir.

Q. And would you describe as best you can any such vehicle.

A. Mr. Udey's car and another small subcompact car.

Q. Do you recall what color this other compact or subcompact car was?

A. It was kind of a yellow cream color.

Q. Now, you say that these people had a conversation there at your father's house on this occasion. Did you overhear any of that conversation?

A. Just that they thought the F.B.I. was closing in. That's—

Q. Now, you say you left to go on an errand; is that correct?

A. To get gas and then come back and unload my truck.

Q. Okay. When you got back, was Ed Udey's car still there and this other cream-colored compact?

A. When I backed my truck into the pasture, they were still there.

Transcript at 322–23. Although during cross-examination she did not place Udey at the scene of this discussion, her testimony raised a question of fact to be resolved by the jury. *See United States v. Vitale,* 728 F.2d 1090, 1094 (8th Cir.1984). The jury may well have believed the testimony Robertson gave during direct examination that Udey was present at this discussion, and on that basis could reasonably have inferred guilt. Additionally, when viewing the evidence in the light most favorable to the government, including all reasonable inferences which may be drawn, we believe that "a reasonable jury could * * * have found beyond a reasonable doubt that the elements of the crime existed." *Jackson, supra,* 680 F.2d at 563. In this case, the defendant's guilt is not being inferred sole-

ly on the basis of his presence or association with members of the conspiracy. *See United States v. Ward,* 703 F.2d 1058, 1062 (8th Cir.1983). Rather, the jury could reasonably have found him guilty based upon his involvement in the May 30th plan to move Kahl from the Russell residence to the Ginter residence in an attempt to avoid the FBI. This conclusion is buttressed by testimony elicited from Karen Robertson on direct examination which clearly established Udey's presence at the meeting in which the FBI's "closing in" was discussed. While Robertson's "I believe Mr. Udey" response may seem equivocal in terms of her placing him at the scene of this discussion, that response must be read in the context of the entire colloquy. Her responses to the preceding and subsequent questions unequivocally place Udey at Russell's home before, during, and after the FBI "closing in" comment. On this basis we hold that the district court correctly denied Udey's motion for acquittal.

**B. Double Jeopardy**

Russell and Udey contend that their sentences under Counts I and II of the indictment constitute double punishment prohibited by the fifth amendment's double jeopardy clause. Count I of the indictment charged the appellants with conspiring to harbor and conceal Kahl; Count II charged the substantive violation of 18 U.S.C. § 1071.

It is axiomatic that the double jeopardy clause protects against multiple punishments for greater and lesser included offenses. *See United States v. Kirk,* 723 F.2d 1379, 1381 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1717, 80 L.Ed.2d 189 (1984). It is equally well established that a defendant does not receive double punishment when he is convicted and sentenced for a substantive offense, and for conspiring to commit the offense. *See United States v. Austin,* 529 F.2d 559, 562 (6th Cir.1976). The appellants assert that *Austin* carves out an exception to these rules where proof of one count estab-

lishes the essential elements of the other. This is a fair interpretation of *Austin.*

In *Austin* the court held:

[I]t is clear that the Fifth Amendment comes into play to prohibit double punishments where the substantive and conspiracy counts of an indictment charge essentially the same offense. * * * The test to be applied to determine whether the offenses are separate or essentially congruent is the "same evidence" test. As the Supreme Court has held, whenever it appears that the proof of one offense proves every essential element of another growing out of the same act, the Fifth Amendment limits the punishment to a single act.

529 F.2d at 562 (citations omitted). Appellants contend that *Austin* was followed by the First Circuit in *United States v. De-Vincent,* 632 F.2d 155, 159 (1st Cir.1980), *cert. denied,* 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981), and the Second Circuit in *United States v. Sperling,* 560 F.2d 1050, 1055 (2d Cir.1977). Appellants incorrectly construe these cases; *DeVincent* merely distinguished *Austin* in a footnote, and *Sperling* involved a conspiracy count and continuing criminal enterprise count, which, as this court has held, are greater and lesser included offenses. *See Kirk, supra,* 723 F.2d at 1381.[3] The Sixth Circuit has itself limited *Austin* to those instances where the substantive offense charges the same agreement or concert of action as the conspiracy count. *See United States v. Fife,* 573 F.2d 369, 372–73 (6th Cir.1976), *cert. denied,* 430 U.S. 933, 97 S.Ct. 1555, 51 L.Ed.2d 777 (1977); *see also United States v. Bankston,* 603 F.2d 528, 534 n. 7 (5th Cir.1979) (limiting *Austin* in the same manner). This is not the factual circumstance presented in this case.

 We believe that the distinction the First Circuit employed in *DeVincent,* is applicable here. That court stated:

There is an exception where the substantive and conspiracy counts happen to charge essentially the same offenses. *United States v. Austin,* 529 F.2d 559, 562–64 (6th Cir.1976). That is not true here even if the exception be extended to a lesser included offense. *As we have said, count one required proof of a con-spiracy, while that was no element of count three; conversely, count three called for actual commission of, or attempt to commit, the crime of extortion, while count one did not extend beyond a conspiracy.*

As this court pointed out in *Cruz, supra,* 568 F.2d at 783, *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), treated the two offenses involved as lesser and greater because each was thought to require as necessary elements concerted action on the part of the participants. That is not true here.

632 F.2d at 159 n. 8 (emphasis added). Here it was not necessary to prove completion of the substantive offense in order to prove conspiracy, nor was proof of a conspiracy necessary to a conviction for the substantive crime charged. Accordingly, we hold that the appellants did not receive unconstitutional double punishment when they were sentenced on the substantive harboring offense under 18 U.S.C. § 1071, and for conspiring to commit that offense.

**C. Suppression of Evidence**

**a) Invalid Warrant**

The Ginters moved to suppress the evidence discovered in their home as having been discovered pursuant to an invalid warrant. The crux of the appellants' argument is that the affidavit in support of the warrant was insufficient to establish probable cause to believe that Gordon Kahl was at the Ginters' residence. They claim the affidavit was based upon hearsay, and that statements contained in the affidavit were incorrect. The affidavits in question stated essentially the following:

I am James T. Blasingame. I am a special agent with the FBI. I am the resident agent in charge of the FBI in Arkansas. A special agent of the FBI who is under my direct supervision and who I know to be reliable and who I will call Agent X in this affidavit informed me that he had been told by a confidential informant who I will call informant Y in this affidavit that informant Y had personally seen Gordon Wendell Kahl on May 30, 1983 traveling with Leonard Ginter and Norma Ginter in a cream colored

---

**3.** In *Kirk* this court specifically declined to decide whether multiple sentencing on conspiracy and criminal enterprise charges violates the double jeopardy clause. Similarly, our resolution of the issue presented by this appeal obviates the need to resolve that issue at this time.

1980 Dodge Omni. Agent X further told me that he personally knew Informant Y was reliable because Informant Y was an upstanding citizen who had never been in any trouble.

The identity of Agent X and Informant Y must be kept secret because the disclosure of Agent X's identity would in turn automatically disclose the identity of Informant Y and such a disclosure would endanger Informant Y. For the same reasons the location where Informant Y saw Gordon Wendell Kahl must be kept secret. Following the sighting of Gordon Wendell Kahl on May 30, 1983 with Leonard Ginter and Norma Ginter an airplane surveillance was undertaken and I personally observed the 1980 cream colored Dodge Omni from a plane in the vicinity of Leonard Ginter's residence located on the Bill Wade property as described above on June 2, 1983 at approximately 4:00 P.M. o'clock.

I am Dero Downing and I am a special agent with the FBI and I personally observed on June 3, 1983 at 10:48 A.M. the cream colored Dodge Omni with Leonard Ginter driving to his residence as described above. I verified by my personal investigation that Leonard Ginter was in Smithville, Ark. on the morning of May 31, 1983.

I, James T. Blasingame do believe that Gordon Wendell Kahl is at the Leonard Ginter residence located on the Bill Wade property as described above because he was traveling with Leonard Ginter as described above on May 30, 1983 and Leonard Ginter was in Smithville on May 31, 1983 and Leonard Ginter and the car Ginter and Kahl were traveling in is presently at the Leonard Ginter residence as described above and in addition I personally know that the Ginter residence located on the Bill Wade property is an isolated area suitable for a hide out for a fugitive such as Kahl.

At trial it was revealed that Agent X was Special Agent Knox of the FBI, and Informant Y was Karen Robertson. The evidence also established that Karen Robertson had not told law enforcement officers that she had seen Kahl in the Ginters' cream colored 1980 Dodge Omni, rather she had described the vehicle as a cream colored subcompact car similar to the one driven by Udey but lighter.

In *United States v. Doty,* 714 F.2d 761 (8th Cir.1983), this court established the analysis to be employed when evaluating hearsay challenges to affidavits supporting warrants. This court opined:

The standards for evaluating the validity of a search warrant based on hearsay were recently modified by the Supreme Court. In *Illinois v. Gates,* [462] U.S. [213], 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), a majority of the Court abandoned the "two-pronged" [*Aguilar-Spinelli* test], and substituted in its place a "totality of the circumstances" approach. *Gates,* 103 S.Ct. at 2332. Under this standard,

[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

In this context, we also observe that courts "evince a strong preference for searches made pursuant to warrant, and, in some instances, may sustain them where warrantless searches based on a police officer's evaluation of probable cause might fail." *United States v. Carlson,* 697 F.2d 231, 237 (8th Cir.1983). "[R]eviewing courts should interpret affidavits in a common-sense and realistic fashion, and deference is to be accorded an issuing magistrate's determination of probable cause." *Id.* Moreover, we are cognizant of the value to be given the corroboration in details of an informant's tip by independent police efforts. *Gates,* 103 S.Ct. at 2334; *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959).

*Id.* at 763. Under the "totality of the circumstances" approach established in *Gates,* and adopted by this court in *Doty,* the affidavits provide a sufficient founda-

tion upon which the magistrate could have found probable cause to issue the warrant.

Here there was a tip given by an informant to an experienced FBI agent, to the effect that Kahl was with a given group of people in a particular type of car. The tip was subsequently corroborated by an aerial surveillance of the defendants' home where the car was in fact seen. We are satisfied that the affidavit provided a sufficient basis for the issuing magistrate's "common-sense" finding of probable cause. *Doty, supra,* 714 F.2d at 763.

Our conclusion is not altered by the alleged misstatement in the affidavit that Karen Robertson described a "cream colored 1980 Dodge Omni." Special Agent Knox testified that although the affidavit attributed this specific description of the vehicle to the informant, he had in fact arrived at this description based on the information she had given him. Even if the affidavit had merely described the vehicle as a "cream colored subcompact" similar to a Dodge Omni, the subsequent corroborating aerial surveillance would have been sufficient to establish probable cause. The fact that there also may have existed probable cause to believe that Kahl was in the Udey vehicle—a cream colored subcompact—does not vitiate or militate against the probable cause determination regarding the Ginters.

■ Assuming arguendo that the warrant was invalid, the evidence discovered during the initial entry into the Ginters' home was nonetheless lawfully seized, and, therefore, admissible. The testimony shows that when Special Agent Blasingame was asked for a search warrant by Leonard Ginter, the shooting began inside the Ginter residence. From that moment forward, the house became the scene of a crime committed in the officers' presence. *See United States v. Singer,* 687 F.2d 1135, 1144 (8th Cir.1982), *aff'd in relevant part,* 710 F.2d 431, 432 (8th Cir.1983) (en banc). Any weapons which were in plain view at the scene of the crime were thereby legitimately seized. Common-sense dictates that the potential danger at the scene of the crime and the attendant exigencies, including the need to aid anyone in the home, validated the initial intrusion into the Ginters' home.

Gordon Kahl's body was discovered during the initial entry into the home by law enforcement authorities. His mini-14 rifle was also discovered pursuant to the initial search. These items were clearly admissible.

■ The Remington pump shotgun belonging to the United States Marshals' office in North Dakota was discovered the day after the shootout pursuant to a search under the warrant. Even if the warrant was improvidently issued, the admission of the shotgun was harmless error beyond a reasonable doubt. *See* FED.R.CRIM.P. 52(a). The plain view discovery of the corpse, subsequently identified as Gordon Kahl, and the mini-14 rifle, clearly provided sufficient evidence upon which to convict the defendants. The shotgun cannot be said to be crucial evidence. Accordingly we hold that the motion to suppress was properly denied.

### b) Ginters' Incriminating Statements

■ The Ginters argue that their initial responses to law enforcement officers' questions regarding the presence of others in their home should have been suppressed as they were not informed of their *Miranda* rights. Without examining the merits of this claim, the appellants concede that their motion to suppress did not address these statements. Furthermore, no objection was made to Agent Blasingame's testimony regarding those statements. Accordingly, the issue was not properly preserved for appeal because no objection was made at trial to the admission of the testimony. FED.R.EVID. 103; *see United States v. Vitale,* 728 F.2d 1090, 1092 (8th Cir.1984); *United States v. Wagoner,* 713 F.2d 1371, 1376 (8th Cir.1983). "Furthermore, we cannot say that appellant's claim amounts to plain error under FED.R. CRIM.P. 52(b)." *Vitale, supra,* 728 F.2d at 1092.[4]

Norma Ginter additionally challenges the admissibility of inculpatory statements she

---

**4.** We note that the Supreme Court recently upheld the "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence. *New York v. Quarles,* — U.S. —, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). We believe that the rationale employed in *Quarles* is applicable to the circumstances presented here and provides an alternative ground upon which to uphold the denial of the Ginters' motion to suppress.

made to law enforcement officers following her arrest. On the night of June 3, 1983, when Mrs. Ginter was being transported from her home to the police station upon being advised of her *Miranda* rights she invoked her right to silence. Later that night, or early the following morning, after being advised of her *Miranda* rights again and executing a document to that effect, she offered a statement to the authorities. At the suppression hearing she testified that this statement was not coerced. On June 7, 1983, Special Agent Calhoun again sought to speak with Mrs. Ginter but she indicated that she did not want to be interviewed. On June 9, 1983, Special Agent Downing interviewed Norma Ginter after again advising her of her rights in writing.

■■■ The appellant claims that her statements should have been suppressed as the agents had no right to resume questioning once she had invoked her right to silence. The district court rejected the appellant's claim. The court held that while invoking the right to counsel *per se* invokes the right to have all interrogation cease until an attorney is present,[5] *see Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981), the reverse was not true. *See Michigan v. Mosley*, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975). In this case the court determined that the appellant had never requested counsel, and that her initial request to remain silent was tentative and equivocal. On this basis the subsequent police-initiated conversations were held not to contravene the accused's constitutional rights. This determination was not factually erroneous, nor does it evolve from an erroneous application of the law. *See United States v. McGlynn*, 671 F.2d 1140, 1143 (8th Cir.1982).

The court recognized that having satisfied the *Edwards* test, an inquiry still remained as to whether or not the waiver of the right to silence was valid. The court stated:

This does not end the inquiry, however. The Court must determine whether Norma Ginter validly waived her right to silence, *i.e.*, whether the purported waiv-

er was knowing and intelligent under the totality of the circumstances.

None of the authorities made any threats, promises or offered any inducements to talk. Norma Ginter was repeatedly advised of her rights and she stated she understood them. She did not request an attorney prior to any of the interrogations. She never stated that she intended to make no statement ever, but rather equivocally advised the authorities that she did not want to talk to them at the particular time.

Considering the totality of the circumstances, the Court believes that the government has demonstrated that Norma Ginter knowingly and intelligently waived her right to remain silent and thus her statements are admissible.

*United States v. Ginter*, Crim. No. 83–30009–01, slip op. at 26–27 (W.D.Ark. Sept. 29, 1983). We believe the district court correctly decided this issue. *See McGlynn, supra*, 671 F.2d at 1143.

■■■ As this court recently stated, the test to be employed when examining the propriety of a resumption of questioning after the right to remain silent has been invoked, is whether the defendant's right to cut off questioning has been "scrupulously honored." *Jackson v. Wyrick*, 730 F.2d 1177, 1179 (8th Cir.1984). Several factors are employed in making this determination where the police renew interrogation.

These factors are: a) whether the police immediately ceased the interrogation upon defendant's request, b) whether they resumed questioning only after the passage of a significant period of time and provided fresh *Miranda* warnings, and c) whether they restricted later interrogation to a crime that had not been the subject of the first interrogation. *Michigan v. Mosley, supra*, 423 U.S. at 106 [96 S.Ct. at 327].

*Id.*

In this case the officers did not pursue questioning when the defendant indicated she did not wish to talk. This was true despite the equivocal nature of the defendant's request to remain silent. After Mrs. Ginter was taken to the police station and

---

**5.** While there is support for a *per se* exclusionary rule where the right to counsel has been invoked, that position does not have uniform acceptance at this time, and no definitive statement has been made by the Supreme Court on

this issue. *See Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 2836 & n. 1, 77 L.Ed.2d 405 (1983) (Powell, J., concurring); *Michigan v. Mosley*, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975).

allowed to rest the officers sought to question the defendant. Nearly six hours had elapsed between the first and second attempt to question the defendant. Fresh *Miranda* warnings were given, and a rights acknowledgement form signed. At the time the third interrogation was attempted the police had no reason to believe the defendant was unwilling to talk. When she expressed some unwillingness to talk, the interrogation was terminated. Forty-eight hours elapsed before the officers resumed questioning again. Although each of the interrogations concerned Gordon Kahl and the June 3, 1983 shootout, this factor alone is not sufficient to find a violation of Ginter's constitutional rights. *See Jackson, supra,* 730 F.2d at 1179–80; *United States v. Finch,* 557 F.2d 1234, 1236 (8th Cir.), *cert. denied,* 434 U.S. 927, 98 S.Ct. 409, 54 L.Ed.2d 285 (1977). Accordingly, we hold that the motion to suppress was properly denied.

■ Finally, Mr. Ginter claims that the district court erred in not suppressing a statement he made to law enforcement authorities at the time of his arrest. It is clear that the statement was voluntarily made by the defendant after he had been informed of his *Miranda* rights. The district court's finding that "Leonard Ginter was anxious to speak his piece," was not clearly erroneous. *See McGlynn, supra,* 671 F.2d at 1143. Accordingly, his motion to suppress was properly denied.

## D. Expert Testimony

At trial the defendants attempted to present testimony of an arson investigator and a chemical analyst, whom they had hired to investigate the source and cause of the fire at the Ginter residence. They assert that such testimony would have shown that government agents intentionally destroyed fingerprint evidence of the burned body taken from the residence. The district court excluded the testimony, and the defendants assert that the court erred in this regard.

6. The district court also noted that the destruction of the fingerprints by the fire potentially served to aid the defendants because it made it more difficult for the government to establish the identification of the corpse.

7. In addition to appellant Russell's offer in this regard, the Ginters made an offer of proof re-

■■ The admission or exclusion of expert testimony is a matter within the sound discretion of the district court. *See United States v. Purham,* 725 F.2d 450, 454 (8th Cir.1984). The district court did not abuse its discretion in excluding the proffered testimony, as it does not appear to have been germane to any issue at trial.

A review of the trial transcript reveals that the defendants did not claim that the government intentionally destroyed Gordon Kahl's fingerprints. Rather, their claim was that certain government documents were relevant to show that the authorities caused the fire. The district court held that only exculpatory evidence was relevant, and that the documents sought were not exculpatory.[6] *See United States v. Peltier,* 731 F.2d 550 (8th Cir.1984). Subsequently, after the district court refused to accept certain expert testimony proffered by the defendants pertaining to the government's conduct regarding the fire, an offer of proof was made.[7] That offer of proof is void of any indication that the law enforcement authorities intentionally destroyed fingerprint evidence; the offer went only to the cause of the fire. This testimony was not relevant to any issue at trial. Accordingly, the district court did not abuse his discretion in this regard.

## E. Counsel of Choice

The Ginters are indigent and were therefore appointed counsel. On October 11, 1983, they filed a motion for counsel of their choice in order to obtain someone who shared their beliefs about this country's tax laws. The district court did not grant their request. Appellants claim that the court erred in this regard.

■ In *United States v. Weninger,* 624 F.2d 163 (10th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980), the court addressed a similar argument and held:

The record indicates that Weninger had no intention of hiring a lawyer unless the lawyer agreed with his views

garding a local marshal's testimony as to the cause of the blaze. Although they delineate this issue in the statement of issues contained in their brief, they do not provide the court with any argument in support of this contention. Therefore, the issue was not properly presented to this court. *See* FED.R.APP.P. 28(a)(4).

about the invalidity of the tax laws. However, the right to assistance of counsel does not imply the absolute right to counsel of one's choice.

624 F.2d at 166. *See also Grady v. United States*, 715 F.2d 402, 404 (8th Cir.1983). On this basis, we believe that the appellants' claim is without merit.

### F. Exclusion of Ginters' Statements to Police

At trial Mr. and Mrs. Ginter sought to call law enforcement officers to the stand to testify as to certain exculpatory comments the defendant had made to the officers after their arrest. The statements were disallowed as hearsay. They now claim the district court erred in not allowing the testimony, as it fell within the exceptions to the hearsay rule. We reject the defendants' arguments.

■ Leonard Ginter relies on FED.R. EVID. 803(3), which provides as a hearsay exception "[a] statement of the declarant's then existing state of mind, emotion * * *." Any evidence of Leonard Ginter's existing state of mind or emotion on June 5, 1983, the date the allegedly exculpatory statement was made, clearly was not relevant to the charges in the indictment which concerned the events of June 3, 1983. *See* FED.R.EVID. 401. This is buttressed by the Advisory Committee Notes to Rule 803(3), which state that this exception is a specialized application of the present sense impression exception contained in Rule 803(1).

■ Both defendants claim their statements were admissible under FED.R. EVID. 804(b)(3), as declarations against interest. They assert that they were unavailable as witnesses, as required by the rule, because of their fifth amendment privilege not to testify. *See Walker v. Lockhart*, 726 F.2d 1238 at 1266 (8th Cir.1984) (Arnold, J., concurring). However, 804(a)(1) defines "unavailability as a witness" as the situation in which the declarant is exempted by ruling of the court on the ground of privilege. As the Advisory Committee Notes state: "[a] ruling by the judge is required, which clearly implies that an actual claim of privilege must be made." The

record in this case reflects neither a claim of privilege, nor a ruling by the court.

■ Finally, we note that the offers of proof with respect to the officers' testimony failed to establish that the statements were inculpatory. The evidence would have shown that the Ginters planned to negotiate the surrender of Kahl in another week. Given the overwhelming evidence in this case, we do not believe the exclusion of this evidence affected the outcome of the trial. To the contrary, any error committed was harmless beyond a reasonable doubt. *See* FED.R.CRIM.P. 52(a).

### G. Sentence

■ Udey challenges the harshness of his sentence. Udey's five year sentence was within the statutory limit for the offense committed. A sentence within the statutory limits is generally not disturbed. *United States v. Caspers*, 736 F.2d 1246, at 1248 (8th Cir.1984). Absent an abuse of discretion "[t]his court will not substitute its judgment for the discretion committed solely to the district court." *United States v. Roth*, 736 F.2d 1222, at 1229 (8th Cir. 1984). The district court did not abuse its discretion in this case.

### CONCLUSION

We have examined the appellants' remaining arguments and find them to be without merit.[8] Accordingly, the convictions are affirmed.

LAY, Chief Judge, concurring and dissenting.

I concur in the majority's holding that there was sufficient evidence to sustain the convictions of defendants Russell and Ginter. I also agree that the alleged procedural and constitutional errors were harmless and did not prejudice Russell and Ginter's trial.

I cannot, however, agree that sufficient evidence exists to convict Edwin Udey of harboring or concealing fugitive Gordon Kahl in violation of 18 U.S.C. § 1071 (1982) or of conspiring to harbor or conceal Kahl in violation of 18 U.S.C. § 371 (1982).

---

**8.** There are several other issues raised in the appellants' briefs, but they fail to set forth any arguments in support of many of these contentions, as required by FED.R.APP.P. 28(a)(4). As to these arguments, the court expresses no judg-

ment, but instead notes that "[w]e are not required to search the record for error," as that burden is on the party alleging such. *Holt v. Sarver*, 442 F.2d 304, 307 (8th Cir.1971).

The record does not provide adequate support for the majority's factual inferences and conclusions surrounding Udey's involvement in either the conspiracy or the actual harboring and concealing of Kahl. The majority states that Robertson's testimony "unequivocally place[s] Udey at Russell's home before, during, and after the FBI 'closing in' comment." Robertson testified only that she *believed* Udey *entered the motor home* with Ginter and Kahl. No testimony revealed what was discussed. As shown in the portion of the record quoted in the majority opinion, the remark describing the FBI as "closing in" did not occur in the motor home, but in Russell's house. Robertson was present at this conversation. She did not identify Mr. Udey as present at or taking part in the discussion.[1] In fact, on cross-examination, Robertson testified that only Wade, Ginter, and Kahl participated in the May 30th conversation:

> Q. I would like to bring you back to that portion of your sworn under oath testimony about the conversation at your father's house with the gentleman you have identified to this jury as Gordon Kahl in which there was talk that the FBI was closing in. Was it the talk that the FBI was closing in on Mr. Gordon Kahl?
>
> \* \* \* \* \* \*
>
> Q. Okay. Please tell me who was having this conversation.
> A. I believe that it was Mr. Wade, Mr. Ginter and Mr. Kahl.
>
> Q. You're not certain?
> A. I do not believe my father [Russell] was entered into this conversation.
>
> \* \* \* \* \* \*
>
> Q. During this discussion that you had about—well, that you've testified under oath that Bill Wade, Mr. Ginter and your Gordon were having conversation about the FBI closing in, was this conversation true? Was the FBI closing in or do you have any knowledge of that?
> A. I didn't have knowledge of it at the time, no. I did not know whether the FBI was closing in or not.
> Q. Didn't you participate in that conversation?
> A. I was standing there, yes.

> \* \* \* \* \* \*
>
> Q. Was Edwin Udey present at that time?
> A. No, sir.
>
> \* \* \* \* \* \*
>
> Q. What did you hear Edwin Udey plan about any of this?
> A. The only thing I know of Mr. Udey doing in this was inviting Mr. Kahl over for supper and coming over and getting him and taking him over for supper.
>
> \* \* \* \* \* \*
>
> Q. This conspiracy, what part did you hear Edwin Udey play?
> A. I have just stated.
> Q. Other than this dinner that you've described, that's it; is that correct?
> A. And Mr. Udey knew who he was and knew he was there.

Transcript at 395–414. Robertson thus clarifies that Udey was not present at the alleged conversation concerning the FBI. The majority considers relevant Robertson's recollection that Udey's car was present at the Russell residence. The presence of Udey's car, however, does not show that Udey was part of the conversation regarding the progress of the FBI.

The government has the burden of proving Udey's guilt beyond a reasonable doubt. *All that has been proven is that Udey was associated with and in the presence of persons who did commit felonies. Cf. United States v. Kelton,* 446 F.2d 669 (8th Cir.1971) (holding that no predicate of proof existed to support the conviction of a defendant for wilfully aiding and abetting the commission of a bank robbery where there was no evidence to show that the defendant had engaged in some affirmative conduct in furtherance of the crime). As this court has stated: "Knowledge of the existence or acquiescence in a conspiracy does not serve to render one a part of the conspiracy. There must exist some element of affirmative cooperation or at least an agreement to cooperate." *United States v. Collins,* 552 F.2d 243, 245 (8th Cir.), *cert. denied,* 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977) *quoted in United States v. Brown,* 584 F.2d 252, 262 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979).

---

**1.** In all due respect, the majority misstates the record when it says that "Karen Robertson testified that Mr. Udey was present during a May 30th discussion \* \* \*."

Further, the prosecution must prove beyond a reasonable doubt that Udey knew a federal warrant had been issued for Kahl's arrest. 18 U.S.C. § 1071 (1982); *see United States v. Hogg*, 670 F.2d 1358 (4th Cir. 1982); 18 U.S.C. § 371 (1982). No evidence, circumstantial or otherwise, has proven beyond a reasonable doubt that Udey knew of the federal warrant issued for Gordon Kahl's arrest. Udey's reference to Kahl as "Curley" or "a hero" fails to show that Udey knew a federal warrant was outstanding for Kahl's arrest. An essential element of both the conspiracy and substantive offense of which Udey was convicted thus is not supported with sufficient evidence.

In light of Robertson's sworn testimony, the record fails to demonstrate sufficient evidence to prove beyond a reasonable doubt that Udey either conspired with Kahl, Ginter, and Russell to conceal and harbor a fugitive or actually did harbor Kahl. I cannot agree that the scant evidence showing Udey's association with his co-defendants and Kahl meets the onerous burden of proof the government must satisfy before it can send any individual, presumed to be innocent, to prison. Udey's conviction should be reversed. *Cf. United States v. Ward*, 703 F.2d 1058 (8th Cir. 1983) (holding that evidence of defendant's fingerprints on marijuana plantholders and evidence establishing defendant's connection with co-conspirators was insufficient to show knowing participation in marijuana growing scheme); *United States v. Brown*, 584 F.2d 252 (8th Cir.1978) (reversing despite considerable circumstantial evidence defendant's conviction of participation in conspiracy to distribute heroin because the evidence did not sufficiently establish defendant's participation).

LAY, Chief Judge, HEANEY, BRIGHT and McMILLIAN, Circuit Judges, dissenting.

We dissent from the denial of the petition for rehearing en banc in the above entitled case. The defendant Udey was convicted for conspiracy to harbor and conceal fugitive Gordon Kahl and for the substantive offense of harboring and concealing him. He was sentenced to prison for five years on each count with the sentences to run concurrently. Although the majority sets forth several pieces of circumstantial evidence, it is undisputed that the testimony of Karen Robertson concerning a discussion held on May 30th is crucial to the affirmance of Udey's conviction. The majority contends that Robertson's testimony shows that Udey was present during a discussion among Mr. Kahl and other defendants in which it was said that the F.B.I. "was closing in." The evidence is undisputed that on May 30th Gordon Kahl was present at the Arthur Russell home. Karen Robertson, the daughter of Mr. Russell, testified on direct examination concerning Udey as follows:

A. I had some stuff in the back of my pickup that I needed to unload and Mr. Ginter and Mr. Udey were at the house and I went to get gas and unload the pickup. And when I was leaving, they all went into the motor home to talk.

Q. Now, when you say, "they all went in the motor home to talk," name the people you're talking about, please.
A. Mr. Kahl and Mr. Ginter and, I believe, Mr. Udey also.

\* \* \* \* \* \*

Q. Now, you say that these people had a conversation there at your father's house on this occasion. Did you overhear any of that conversation?

A. Just that they thought the F.B.I. was closing in. That's—

Mr. Udey was convicted because the prosecutor asked Karen Robertson whether "these people had a conversation there at your father's house on this occasion." The majority infers that "these people" included Mr. Udey. The fundamental question is whether Karen Robertson intended to include Udey in on that conversation. She admittedly was present at the time.

On cross-examination Robertson was asked specifically the following:

Q. Okay. Please tell me who was having this conversation.
A. I believe that it was Mr. Wade, Mr. Ginter and Mr. Kahl.

\* \* \* \* \* \*

Q. Didn't you participate in that conversation?
A. I was standing there, yes.

\* \* \* \* \* \*

Q. Was Edwin Udey present at that time?

A. No, sir.

\* \* \* \* \* \*

Q. What did you hear Edwin Udey plan about any of this?

A. The only thing I know of Mr. Udey doing in this was inviting Mr. Kahl over for supper and coming over and getting him and taking him over for supper.

\* \* \* \* \* \*

Q. This conspiracy, what part did you hear Edwin Udey play?

A. I have just stated.

It is difficult for us to believe that a defendant may be sentenced to five years in prison because of an ambiguous leading question on direct examination which is later clarified by the witness so as to exclude the defendant from any incriminating conversation.