**Maurice Eugene DANCY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 262-85.**

Court of Criminal Appeals of Texas, En Banc.

March 18, 1987.

Mary Anne Wiley, G. Thomas Cannon, Ralph H. Brock, Lubbock, for appellant.

John T. Montford, Former Dist. Atty., Jim Bob Darnell, Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appellant was convicted of murder. The convicting jury assessed his punishment at life imprisonment. On appeal the conviction was affirmed in an unpublished opinion by the Court of Appeals. *Dancy v. State* (Tex.App.—Amarillo, No. 07–81–0057–CR, Dec. 31, 1984).

On appeal appellant contended, inter alia, that certain items obtained (1) as a result of his illegal arrest and (2) from his apartment pursuant to a search warrant issued without probable cause were improperly introduced into evidence against him. The Court of Appeals overruled both of these grounds of error (2nd and 3rd) and held that the trial court properly denied, after a hearing, appellant's motion to suppress evidence. We granted the second and third grounds of review in appellant's petition for discretionary review to consider the correctness of the above holdings of the Court of Appeals.

On August 21, 1979, the deceased, Claude Ventry Bridges, a doctoral candidate at Texas Tech University, was to complete the final day of his qualifying examinations for his doctorate degree. At lunch time a professor and a fellow student became concerned because Bridges had failed to appear for the exams, and decided to stop at Bridges' home to check on him. They found the front door of the house wide open, and upon entering the house, they found Bridges' body lying face down. The autopsy revealed that Bridges died as a result of a hard blow to the neck which fractured his larynx causing him to suffocate.

Outside the window through which entry into the deceased's house was gained the police found a red letter jacket with a "C" affixed to it, as issued by the Coronado High School in Lubbock. A large green comb was found near the deceased's body. A book entitled *Theory in Practice* was obtained by the police at the scene because of an apparent shoe imprint on it. The deceased's wife was unable to identify either the jacket or the comb.

On August 22, 1979, three television stations in Lubbock cooperated with the police by exhibiting the jacket and comb on newscasts about the homicide. Viewers were requested to contact police if they had any information concerning the items or the owner or owners of the items.

About 4:30 p.m. on August 22nd during a discussion at the police station about the jacket Detective Tommy Wilbanks told Sgt. Charley Park that he knew that appellant Maurice Dancy lived in the area where the homicide occurred, that Dancy had gone to Coronado High School and had a Coronado jacket. It was recognized that there were a number of such jackets in Lubbock. Later in the afternoon Wilbanks produced a photograph of appellant in such a jacket

apparently taken when appellant had been booked in jail in February 1979. The address of appellant furnished by Wilbanks was not correct, however.[1] At the time there were no leads, no suspects, but Park testified they intended "to try to locate Mr. Dancy and talk with him."

Detective Joe Nevarez testified that shortly after the television newscasts about 6:30 p.m. on August 22, 1979 he received a telephone call at the Homicide Division. The caller requested to speak to Detective Bill Townley. Upon being advised that Townley was "off duty," the caller hung up. A few minutes later another call was received and the caller again asked for Townley. When told that it was Townley's day off, the caller asked for Detective Ralston and was told Ralston had gone home for the day. The caller inquired how these officers could be reached as the caller needed to talk to one of them. Nevarez told the caller he would try to locate one of the officers and have him call. The caller gave a telephone number where he could be reached, and in response to Nevarez's inquiry identified himself as Maurice Dancy and gave an address where he could be found. Nevarez transferred the call to Sgt. Park, who briefly talked to the caller and conveyed the information to Ralston at his home.

Detective Goolsby picked up Ralston and they drove to the address given, arriving about 7:30 p.m. on August 22nd. Ralston had had previous contact with appellant when he (Ralston) had been looking for a member of the appellant's family, Sam Dancy. When Ralston knocked on the door of the residence, appellant answered. There were one or two white males inside the house. Ralston advised appellant he had been informed appellant "wanted to talk to me about something," and asked if appellant would come out to the car, an unmarked police vehicle. At the car appellant told Ralston "he had seen on TV that they had a coat, and he thought it might have been his, because his had been stolen a day or two before that." The jacket was

at the police station. Ralston informed the appellant they needed to go to the police station to talk about the jacket which appellant had reported stolen. Appellant agreed. Ralston testified appellant voluntarily got into the police vehicle, that he did not place appellant under arrest or handcuff him, or read to him any *Miranda* warnings. On the way to the station Ralston related they just "shot the breeze" and there was no conversation about the jacket or the offense with appellant by him or Goolsby. Ralston, with the burglary detail, sought only to bring the appellant to the station. He was not actively involved in the investigation. At the police station he took the appellant to the Detective Division and then went home.

Upon arriving at the police station, appellant was given his *Miranda* warnings at 7:52 p.m. by Detective Daniel. According to Daniel appellant stated he understood his rights and that he indicated he wanted to talk to the officers; that he had come "down there" to talk about the coat that the police had. Appellant was not told he was under arrest. Daniel testified appellant identified the jacket in question as his because of a torn sleeve and stated "because his jacket was missing, and that is the reason he came to the Police Department, to see the jacket." Appellant then was shown a green comb, and stated he had such a comb "which looked like the comb that we had."

Appellant was asked to give a hair sample to the police and Detective White, who was present, stated appellant gave the sample freely and voluntarily. White noticed that appellant's knuckles appeared to be skinned and Detective Daniel observed what appeared to be red stains on appellant's tennis shoes and thought the stains could be blood (later shown to be red paint). When Daniel asked to look at the shoes, appellant took them off and gave them to Daniel freely and voluntarily. They were handed to Officer Riemer, who compared the shoes with the print on the book found

---

1. It is not clear from the record whether the incorrectness of the address furnished by Wil-

banks was determined then or by later events.

at the homicide scene. It was then determined according to White that the print "could have been made by the shoe."

At this point about 8:30 p.m. White and other officers determined they had probable cause to obtain a warrant for appellant's arrest and contacted the district attorney's office for legal assistance in obtaining an arrest warrant and a search warrant. According to the officers, appellant, prior to this time, was not placed under arrest and he did not request or attempt to leave. When asked, White and Daniel stated that at this point (8:30 p.m.) they would not then have permitted appellant to leave because they feared they might never find him. The items in question were already in possession of the police.

At approximately the time (8:30 p.m.) the officers determined they had probable cause for arrest, appellant exercised his rights and requested to contact his attorney. Appellant was immediately furnished a telephone and called Attorney Mackey Hancock. Attorney Hancock testified as the only defense witness at the suppression hearing. He testified that appellant called him and commenced talking about the letter jacket that was shown on television, that he "went to pick it up, claimed it, or something to that effect," indicated he was talking to the police at the Lubbock Police Department. Asking questions Hancock elicited enough information to know "he was either under arrest for murder, or being held for questioning on the murder...." He advised appellant to terminate any interview.

Attorney Hancock also testified he arrived at the police station about 9 p.m. and learned appellant had been transferred to the county jail. Upon arriving there at 9:30 p.m. Hancock found appellant in "jail whites" at the booking area. They talked and discussed financial matters and Hancock advised the appellant to seek a court-appointed attorney; and repeated the advice earlier given and explained the charge on which appellant was being booked. Hancock did not stay for the arraignment. He stated he arrived home about 10:30 p.m.

Detective White testified appellant was booked at approximately 10 or 10:30 p.m. after being notified by the district attorney's office an arrest warrant had been issued. The record shows the arrest warrant was issued at 10:52 p.m. by District Judge Shaver, acting as a magistrate. Appellant was arraigned at 11 p.m. by a Justice of the Peace. Detective Daniel testified that once the officers believed they had probable cause to arrest they acted as expeditiously as possible in procuring one.

Appellant in his petition for discretionary review contends the Court of Appeals erred "in holding that appellant was not under arrest when items were seized from his persons and such items were admissible in violation of appellant's constitutional and statutory rights."

While the "items" are referred to as "various items" and as "evidence seized," they are not otherwise identified or listed. An examination of ground of error No. 2 in appellant's brief filed in the Court of Appeals is of no help. In its opinion the Court of Appeals refers to such items that appellant sought to exclude by ground of error No. 2 as the jacket, comb, hair sample and shoes. However, the jacket and comb were found at the scene of the crime. They were not seized from appellant's person and were not sought to be excluded by appellant's motion to suppress evidence. It appears then that appellant is complaining of the admission into evidence of the hair sample and the shoes.

"A person is arrested when he has been actually placed under restraint or taken into custody...." Article 15.22, V.A.C. C.P. "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980).

Appellant argues that his arrest occurred when he left his residence in company with Detectives Ralston and Goolsby. Appellant contends that prior to his telephone call to the police they intended to try to

locate and talk to him, and that Ralston, prior to contacting appellant, knew other officers strongly suspected it was appellant's jacket that had been recovered at the scene, that Ralston intended to take him back to the police station, and if necessary force would have been used.[2]

■ There was a general investigation into an unsolved crime. A jacket and a comb were found at the scene. Arrangements were made to show the items on television newscasts about the killing. Officer Wilbanks reported to investigating officers that appellant had such a high school jacket, a number of which were in Lubbock, and lived in the neighborhood where the deceased was found. He later was able to locate a photograph of the appellant. Sgt. Park decided that the police should try to locate and talk to the appellant. Such would have been good police practice. Shortly after the above information was received and before any action was taken, appellant called the police under the circumstances earlier described. He indicated he wanted to talk to one of two officers. He did not at that time say anything about the jacket in question. Ralston, a burglary detective not connected with the investigation, was sent to contact appellant at his request. There, outside the residence at the police car, appellant told Ralston he had seen the "coat" on television and thought that it might have been his which had been stolen. The appellant thus "literally thrust himself under the scrutiny of the investigating officers" as the defendant in *Ussery v. State*, 651 S.W.2d 767, 770 (Tex.Cr.App. 1983). Appellant went voluntarily to the police station thereafter. He was not arrested, handcuffed or forced, nor was he interrogated on the way to the station. He later told Detective Daniel and Attorney Hancock he had come to the station house to "talk about the coat" or to "claim it." The testimony of Ralston as to what might have happened if appellant had refused to come with him rather than voluntarily giving information about the jacket and consenting to come to the police station was testimony as to a hypothetical situation, and has little bearing on the question of whether the police conduct objectively viewed, restrained appellant's liberty by the showing of force or authority. See and cf. *Mallard v. State*, 708 S.W.2d 27 (Tex. App.—Texarkana 1986).[3]

■ Findings by the trial court should not be disturbed absent a clear abuse of discretion. From the totality of the circumstances there was ample evidence to support the finding the appellant was not arrested at his residence by Ralston as contended by the appellant. The Court of Appeals was not in error in this regard.

■ When appellant arrived at the police station, he was not searched, fingerprinted, handcuffed, photographed or told he was under arrest, many of the procedures customarily associated with an arrest. Detective Daniel did give the appellant his *Miranda* warnings, but mere recitation of such warnings is more indicative of proper cautiousness than it is of the officer's intent to arrest. *People v. Gale*, 72 Ill. App.3d 23, 28 Ill.Dec. 562, 390 N.E.2d 921 (1979), cert. den. 445 U.S. 944, 100 S.Ct. 1341, 63 L.Ed.2d 778.

Appellant was shown the jacket and identified it as the one stolen from him. Upon being shown the green comb, he stated he had a similar comb, and it is undisputed

---

**2.** The record reflects:

"Q If he had given you any trouble were you under the impression you would have taken Maurice Dancy downtown?

"A Yes, Ma'am, probably. Like I say, Detective Goolsby was actually investigating the case,—

"Q Right.

"A —And it would, more or less, be up to him.

"Q And that time, if you had gone to Maurice Dancy's door, and he had refused to go with you, would you have used force at that time? I am not talking about shooting him, I am talking about force enough to accomplish taking him downtown?

"A Yes, Ma'am, I believe we would."

**3.** In *Mallard* an officer stated in a probable cause affidavit that the defendant was in custody. The court held that the conclusion stated by the officer was not binding on the fact finder, that the totality of the circumstances must be considered and there was more than ample evidence that Mallard was not in custody when he made the oral statement.

that he gave a hair sample voluntarily upon request. After officers noticed red stains on his tennis shoes, appellant freely gave his shoes to officers upon request. When one of the shoes fit the print on the book found at the scene, the officers concluded that they had probable cause to arrest and sought legal help in obtaining the proper warrant. Prior to this time appellant was not placed under arrest, and he did not request to leave or attempt to leave. Further, there were no acts showing an intention to take appellant into custody. All of the above occurred in about 38 minutes.

At the hearing on the motion to suppress appellant did not testify. The only defense witness was Attorney Hancock, who testified as to facts after the giving of the hair sample and the shoes.

In *People v. Miller,* 89 Ill.App.3d 973, 45 Ill.Dec. 42, 412 N.E.2d 175 (1980), cert. den. 454 U.S. 871, 102 S.Ct. 339, 70 L.Ed.2d 175, the defendant was questioned as a witness and then became a suspect, at which time the officer requested he come to the station and the defendant "readily assented." In holding there was no arrest or seizure within the Fourth Amendment, the Court held the question is "whether, considering all the circumstances, a reasonable man, innocent of any crime, would have considered himself under arrest, and not whether the defendant, with his subjective knowledge and fears, would have considered himself under arrest." See also *People v. Gale,* supra; *People v. Eddmonds,* 101 Ill.2d 44, 77 Ill.Dec. 724, 461 N.E.2d 347 (1984).

■ Further, a defendant's presence at a police station by consent does not change into arrest by virtue of an officer's subjective view alone that the defendant was not free to leave absent an act indicating an intention to take the defendant into custody. *Commonwealth v. Holmes,* 482 Pa. 97, 393 A.2d 397 (1978).

What was said in *People v. Wipfler,* 68 Ill.2d 158, 11 Ill.Dec. 262, 368 N.E.2d 870, is applicable to the instant case.

"What actually took place here was no more than what was minimally necessary for the police to successfully investigate a crime, as is their duty. * * * To hold

that this amounted to an arrest would be to hold virtually any stationhouse interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. This would mean that the police could not request the presence of anyone, even for noncustodial questioning unless and until they had probable cause to arrest the person to be questioned. We see no reason to so restrict the investigatory function of the police." *Wipfler,* 11 Ill.Dec. at 265, 368 N.E.2d at 873.

In *Shiflet v. State* (Tex.Cr.App. No. 812–82, Oct. 9, 1985) (not yet reported), this Court in considering custody within the meaning of the Fifth Amendment, stated:

"We are unaware of any rule of law which forbids lawfully constituted officers of the law from requesting persons to accompany them, or of providing transportation to the police station or some other relevant place in furtherance of an investigation of a crime. Nor are we aware of any rule of law that prohibits police officers from voluntarily taking a person to the police station or some other relevant place in an effort to exonerate such person from complicity in an alleged crime. Nor are we aware of any rule of law which forbids one to reject such request. If the circumstances show that the transportee is acting only upon the invitation, request, or even urging of the police, and there are no threats, express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not then in custody. In other words, under those circumstances, such person has not been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda v. Arizona,* supra."

■ Where a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated ·in committing the crime, we are unable to hold that under the circumstances such a

person is restrained of his freedom of movement. Under those circumstances, he is not in custody. See and cf. *Ussery v. State,* supra; *Martinez v. State,* 635 S.W.2d 629 (Tex.App.—Austin 1982); *Stone v. State,* 583 S.W.2d 410 (Tex.Cr. App.1979); *Penry v. State,* 691 S.W.2d 636 (Tex.Cr.App.1985); *Gregg v. State,* 667 S.W.2d 125 (Tex.Cr.App.1984); *Gutierrez v. State,* 708 S.W.2d 937 (Tex.App.—Corpus Christi 1986); *Mallard v. State,* 708 S.W.2d 27 (Tex.App.—Texarkana 1986).

The Court of Appeals found the items in question were in the hands of the police before any arrest, and thus were not the fruits of an illegal arrest, *Townsley v. State,* 652 S.W.2d 791, 797 (Tex.Cr.App. 1983), and that the trial court did not err in overruling the motion to suppress.

Given the totality of the circumstances, we cannot conclude that the trial judge as a fact finder abused his discretion in overruling the motion to suppress, or in admitting the items into evidence at the trial.

Appellant also contends the items taken from his apartment pursuant to a search warrant issued without probable cause were improperly admitted into evidence. He argues the Court of Appeals erred in that holding that after excising false portions of the search warrant affidavit there remained sufficient probable cause in support of the search warrant.

Appellant relies upon *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and the requirements of Article 18.01(c), V.A.C.C.P., with regard to the issuance of an evidentiary search warrant issued pursuant to Subdivision (10) of Article 18.02, V.A.C.C.P.

■ The search warrant affidavit is found in the record.[4] The Court of Appeals

---

4. The search warrant affidavit in pertinent part reads:

"The undersigned Affiant, being a Peace Officer under the laws of Texas and being duly sworn, on oath makes the following statements and accusations:

"1. THERE IS IN LUBBOCK COUNTY, TEXAS, A SUSPECTED PLACE AND PREMISES DESCRIBED AND LOCATED AS FOLLOWS:....

"2. THERE IS AT SAID SUSPECTED PLACE AND PREMISES PROPERTY CONCEALED AND KEPT IN VIOLATION OF THE LAWS OF TEXAS AND DESCRIBED AS FOLLOWS:

"1. Several old coins taken from the residence of Claude Bridges at 2824–23rd Street, Lubbock, Texas[.]

"2. A white plain envelope with the name[s] of Danell Mills and J.P. Stevens.

"3. Two (2) old silver dollar coins (prior to 1940).

"4. One (1) mercury nickel with woman's head on it.

"5. Other assorted coin collector's items.

"6. Clothing worn by Maurice Dancy on August 20, 21, 22, 1979.

"7. Shoes worn by Maurice Dancy on August 20, 21, 22, 1979.

"8. Any other items of personal property belonging to Claude Bridges, the deceased, or Mary Bridges, his wife.

3. SAID SUSPECTED PLACE AND PREMISES ARE IN CHARGE OF AND CONTROLLED BY EACH OF THE FOLLOWING PERSONS:

"1. Maurice Dancy, a black male DOB/02–29–60

"2. Person or persons unknown to affiant

4. YOUR AFFIANT STATES THAT AN OFFENSE HAS BEEN COMMITTED, TO–WIT: A homicide, being the knowing, intentional killing of Claude Bridges, a male, on or about August 21, 1979, who resided at 2824–23rd Street, Lubbock, Texas. The said Claude Bridges being stomped to death.

"5. Your Affiant states that the specifically described property or items that are to be searched for or seized constitute evidence that the offense of murder as alleged was committed and that the said Maurice Dancy committed that offense.

"6. Your Affiant states that the property and items constitute evidence are located at the above premises or on the person of Maurice Dancy and the premises to be searched.

"7. IT IS THE BELIEF OF AFFIANT, AND HE HEREBY ACCUSES THAT: Maurice Dancy did on or about the 21st day of August 1979, did then and there knowingly cause the death of an individual, Claude Bridges, by stomping him with his foot.

8. AFFIANT HAS PROBABLE CAUSE FOR SAID BELIEF BY REASON OF THE FOLLOWING FACTS:

"a. Affiant, Sgt. Charles Park, is employed by the City of Lubbock Police Department and is assigned to the Detective Division.

"b. On August 21, 1979, your Affiant observed the dead body of Claude Bridges at his residence located at 2824–23rd Street, Lubbock, Texas. Said body had been blougeaned (sic) and severely beaten.

"c. Your Affiant observed a red letter jacket bearing the letter 'C' for Coronado High School in Lubbock, Texas was found by the window of 2824–23rd Street on August 21, 1979.

observed that appellant relied upon misrepresentations of material facts which were false or recklessly made and which were found in subparagraphs (f), (g) and (i) of paragraph 8 of the affidavit. The court found the statement in subparagraph (f) that appellant claimed the jacket was true and the appellant was in error. The Court of Appeals did find, however, that the statement in subparagraph (g) that affiant Park had observed appellant's tennis shoes, and in subparagraph (i) that affiant Park had personally taken the deceased's wife to the crime scene were false. The record, however, does not support the Court of Appeals' finding as to subparagraph (g). At the suppression hearing affiant Park testified he personally observed the red stains on appellant's tennis shoes at the police station. If there were any misrepresentations, it is in subparagraph (i) where affiant Park stated he "personally" took the wife of the deceased to the scene of the crime, etc. It is here observed that despite its findings as to subparagraph (g) and (i) the Court of Appeals held that the remainder of the affidavit for a search warrant was still valid for the issuance of a search warrant and items under its authority were admissible, citing *Brown v. State*, 605 S.W.2d 572, 577 (Tex.Cr.App.1980).

In *Franks*, supra, the United States Supreme Court stated:

"*... where the defendant makes a substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, *the Fourth Amendment requires that a hearing be held at the defendant's request.* In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." (Emphasis supplied.)

The Court also stated:

"... Judge Frankel, in *United States v. Halsey*, 257 F.Supp. 1002, 1005 (S.D.N.Y.1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported), put the matter simply: '[W]hen the Fourth Amendment demands a factual showing sufficient to comprise "probable cause," the obvious assumption is that there will be a *truthful* showing' (emphasis in original). This does not mean 'truthful' in the

"d. Your Affiant knows the person, Maurice Dancy, who lives at 2826–24th Street (rear), Lubbock, Texas, approximately one (1) block from the scene of the killing at 2824–23rd Street.

"e. On August 22, 1979, Channels 11, 13 and 28 showed the jacket found, on the 6:00 pm news and asked for assistance from the public in locating the owner of said jacket.

"f. At approximately 6:30 pm on August 22, 1979, Maurice Dancy called the police department asking to speak to Detective Bill Townley, detective, Lubbock Police Dept. Subsequently, after arrival at the police department, the said Maurice Dancy claimed the red jacket, with the Letter 'C', as his own.

"g. When the said Maurice Dancy was claiming the said jacket, your Affiant observed what appeared to be a red substance splattered on the tennis shoes Maurice Dancy was wearing. Your Affiant observed the body of Claud[e] Bridges and it appeared he was stomped on the neck with imprints resembling markings made by the bottoms of tennis

shoes. It also appeared to Affiant that portions of the tennis shoes of the said Maurice Dancy had been painted over by red paint or a red substance in the are of the red spots.

"h. Your Affiant further stated that the said Maurice Dancy lettered at Coronado High School in Lubbock County, State of Texas, and his photo appears in that school's year book.

"i. Your Affiant personally took the wife of Claude Bridges to 2824–23rd Street, Lubbock, Texas this date and several old coins, two (2) old silver dollars, and other assorted coins and items were missing from the said premises where Claude Bridges, deceased, and Mary Bridges, his wife, reside.

j. Your Affiant has examined a color photograph of Maurice Dancy made by the Lubbock Police Department on February 2, 1979, and said photograph shows the said Maurice Dancy wearing a red Coronado letter jacket identical in appearance to the one found at 2824–23rd Street, Lubbock, Texas on August 21, 1979...."

sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant are true." 98 S.Ct. at 2681.

Still later the Court wrote:

" ... *Our reluctance today to extend the rule of exclusion beyond instances of deliberate misstatements, and those of reckless disregard,* leaves a broad field where the magistrate is the sole protection of a citizen's Fourth Amendment rights, namely, in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination." (Emphasis added.) 98 S.Ct. at 2683.

In *Ramsey v. State,* 579 S.W.2d 920, 922 (Tex.Cr.App.1979), this Court pointed out that under *Franks,* in order to be entitled to an evidentiary hearing on the allegations concerning the veracity of the affidavit, the defendant must:

"1. Allege deliberate falsehood or reckless disregard for the truth by the affiant, *specifically pointing out the portion of the affidavit claimed to be false. Allegations of negligence or innocent mistake are insufficient, and the allegations must be more than conclusory.*

"2. *Accompany these allegations with an offer of proof stating the supporting reasons.* Affidavits or otherwise reliable statements of witnesses should be furnished. If not, the absence of written support of the allegations must be satisfactorily explained.

"3. Show that when the portion of the affidavit alleged to be false is excised from the affidavit, the remaining content is insufficient to support issuance of the warrant.

98 S.Ct. at 2685." (Emphasis supplied.) *Ramsey* at 922, 923.

In his only motion to suppress appellant sought to suppress both items obtained as a result of an illegal arrest and items seized as a result of an execution of an illegal search warrant. Referring to the items obtained pursuant to the search warrant, the suppression motion alleges:

"The search and consequent seizures of these items were illegal by virtue of certain defects in the search warrant and in the affidavit upon which the search warrant issued, to wit: The affidavit for the search warrant failed to state facts sufficient to constitute probable cause for the issuance of the search warrant; the objects to be seized were described so broadly as to constitute a general search warrant; the affidavit for the search warrant states facts to constitute probable cause which were the fruits of the illegal arrest and search and seizure of the Defendant."

■ Clearly by his motion to suppress appellant failed to make "a substantial preliminary showing" of a *Franks* claim. 438 U.S. at 155, 98 S.Ct. at 2676, 57 L.Ed.2d at 672. See *Ramsey,* supra. "Absent such a showing as would warrant a *Frank* hearing, this Court will not look beyond the four corners of the affidavit. *Ramsey v. State,* supra." *Brooks v. State,* 642 S.W.2d 791, 796–797 (Tex.Cr.App.1986).

There, of course, was a hearing on the motion to suppress. In the course of his testimony on a number of matters, Sgt. Park, the affiant, testified he and other officers sought the legal aid of the district attorney in preparing the search warrant affidavit, that it took about an hour and a half to prepare it, and that it was typed by an assistant district attorney. On direct examination Sgt. Park was asked:

"Q Is everything in there [affidavit] true and correct to the best of your knowledge?

"A Yes, sir it is."

On cross-examination the following information was elicited from Sgt. Park:

"Q Now, it is my understanding you did not go back out to the victim's home?

"A  No, ma'am.

"Q  After the initial preliminary investigation you-all did on the 21st?

"A  No, ma'am.

"Q  Did you, yourself, ever talk to Mrs. Laura (Sic.) Bridges?

"A  I just said a few words to her. I didn't question her about anything. Detective White did that.

"Q  Okay. No discussions concerning the case, other than, 'Sorry it happened,' but no detailed information at all?

"A  No."

Sgt. Park was not further interrogated as to other circumstances of the preparation and execution of the affidavit. He was never asked for an explanation of the apparent inconsistency. He was never asked whether the statement in the affidavit that he "personally" took Mrs. Bridges to the scene was a knowingly or intentionally misrepresentation, was a false statement, or made in reckless disregard for truth, or was a mistake, etc. He certainly did not acknowledge that the statement was false.

Detective George White testified at the suppression hearing that on August 22nd, the day after the alleged offense, he had taken Mary Louise Bridges to the residence where the killing occurred, and that she had discovered some old coins missing, and found a comb that did not belong there. White related he relayed the information concerning the coins and comb to Sgt. Park later that day.

In argument following the suppression hearing, appellant's counsel stated:

"Further, in Paragraph I [subparagraph (i)], and the State has already spoken to this point,[5] it says: 'Your affiant personally took the wife of Claude Bridges to 2824—23rd, Lubbock, Texas, this date, and several old coins, two (2) old silver dollars, and other assorted coins and items were missing from the said premises where Claude Bridges, the

deceased, and Mary Bridges, his wife, resided.'

"The affiant on the stand today said no, he had not gone out to the house, he had not had contact with Mary Bridges. He knew nothing. He had talked to her in the hall, but had no questioned her concerning these coins, and he had not personally taken the wife out to the premises. Another misstatement. *I am not claiming it to be a purposeful misstatement,* but it is, in fact, a misstatement. It is wrong, and the State even agreed in their argument that Paragraph I is wrong, ...

\*      \*      \*      \*      \*      \*

"If it is not a purposeful misrepresentation, may it please the Court, and *we are agreeing at this time that it was not a purposeful misrepresentation,* Paragraph I must go. The State has agreed that Paragraph I is a misrepresentation in the affidavit. I don't believe there is any contest to that point, now." (Emphasis supplied.)

■ There was no showing that the statement in subparagraph (i) was made with the type of knowledge, intent, or recklessness as contemplated by *Franks*. See *Clayton v. State,* 652 S.W.2d 950, 954, 955 (Tex.Cr.App.1983), U.S. cert. den., 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984); *Brooks v. State,* supra, at 797; *Ellerbee v. State,* 631 S.W.2d 480 (Tex.Cr.App.1982) (opinion on rehearing) and cases there cited.

Further, if the statement was an instance "where the police have been merely negligent in checking or recording the facts relevant to a probable cause determination," *Franks,* 98 S.Ct. at 2683, then as such, it is beyond the pale of *Franks.*

■ Under *Franks,* the false statement in the affidavit must have been either intentional or made with reckless disregard for the truth, and must have been necessary to the finding of probable cause, in order to render the warrant invalid.

5. The State noted in its argument to the trial court the apparent inconsistency between the testimony and the allegations in the affidavit as to Park taking Mrs. Bridges to the scene, but contended such would not in itself have rendered the affidavit invalid.

*Franks,* supra, 438 U.S. at 155–56, 98 S.Ct. at 2676–77. A misstatement in an affidavit that is merely the result of simple negligence or inadvertence, as opposed to reckless disregard for the truth, will not render invalid the warrant based on it. Id. at 171, 98 S.Ct. at 2684; *United States v. Carlson,* 697 F.2d 231, 238 (8th Cir.1983); *United States v. Hole,* 564 F.2d 298, 302 (9th Cir. 1977). See *United States v. Botero,* 589 F.2d 430, 433 (9th Cir.1978).

The appellant neither alleged nor proved that he was entitled to any relief under *Franks.*

The judgment of the Court of Appeals is affirmed.

CLINTON, Judge, dissenting.

The majority holds that at the time he entered the police car to go downtown, appellant was not "restrained of his freedom of movement." See Art. 15.22, V.A.C. C.P. and *Hardinge v. State,* 500 S.W.2d 870, 873 (Tex.Cr.App.1973). Ultimately I agree with that conclusion, but I cannot agree that this ends the analysis. In my view, notwithstanding that appellant voluntarily accompanied the officers downtown, by the time he submitted to the taking of a hair sample and surrendered his tennis shoe, he found himself under circumstances amounting to "a show of authority" such that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

It is reasonably clear that appellant consented to go to the police station to discuss the matter of the letter jacket. At least the officers testified he entered the police

car "voluntarily," under no apparent force or show of authority. Not at all clear, on the other hand, is that he went downtown with any intent of relinquishing a sample of his hair or of giving over a shoe. The burden of proof falls squarely on the State to prove that the scope of appellant's consent extended to these matters. See *Gregg v. State,* 667 S.W.2d 125, 128 (Tex.Cr.App. 1984). Yet by the time appellant purportedly "volunteered" to supply this evidence against himself, he had already been subjected to "seizure" for Fourth Amendment purposes.

Distinguishable from this case is *Clark v. State,* 627 S.W.2d 693 (Tex.Cr.App.1982) (Opinion on Motions for Rehearing), in which the defendant went voluntarily to the police station at the request of a police officer he knew. At the station he consented to be fingerprinted, and was not formally arrested until after his fingerprint was compared to one found at the scene of the crime. This Court found the defendant was not "seized" for Fourth Amendment purposes until after he gave the fingerprint exemplar. In arriving at that decision, however, the Court found significant the fact that the defendant was *told* he was free to leave at any time. In light of that and other circumstances, "a reasonable person would have believed that he was free to leave." *Clark,* supra at 700, citing *Mendenhall,* supra. By contrast, appellant herein was not told he was free to leave, and in fact he was not. At the police station he was taken into an office with three or four investigators. He was promptly given his *Miranda* [1] warnings. It would have been reasonable for appellant to assume he was under arrest when he was informed of his custodial rights. [2] In light of these circumstances a reason-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. While the reading of *Miranda* warnings may be more indicative to a majority of this Court "of proper cautiousness than it is of the officer's intent to arrest," I daresay the typical layperson, having heard a police officer recite him his "rights," would quickly conclude he was not free to go. That officers should demonstrate caution by exercising those "procedural safeguards" *Miranda* dictates "to secure the privilege against

self-incrimination," must surely be considered an objective indicator that appellant "ha[d] been taken into custody or otherwise deprived of his freedom of action in [some] significant way." 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. Is the reasonable man in appellant's shoes to believe he was "in custody" for purposes of determining his rights under the Fifth Amendment, but not sufficiently restrained to invoke those he enjoys under the Fourth?

able person in appellant's position would not have concluded that he was at liberty simply to walk out. Moreover, as in *Florida v. Royer*, at the time appellant gave the hair sample and tennis shoe, "the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity." 460 U.S. at 502, 103 S.Ct. at 1326–27, 75 L.Ed.2d at 239. Here, as there, "[w]hat had begun as a consensual inquiry" as to whether or not a letter jacket belonged to appellant, "had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations," *viz:* that the jacket had been stolen from him, "sought to confirm their suspicions." 460 U.S. at 503, 103 S.Ct. at 1327, 75 L.Ed.2d at 240.

This "investigative procedure" was patently illegal. The only information the police had at that time was that appellant lived in deceased's neighborhood and that his jacket, which he claimed had been stolen from him, had been found outside a window at the scene of the murder. These facts may have given rise to a strong suspicion that appellant was involved in the offense or knew something about it, but they fell well short of probable cause to arrest. *Ussery v. State*, 651 S.W.2d 767, 770–71 (Tex.Cr.App.1983). Appellant was therefore illegally detained when the hair sample and tennis shoe were surrendered, and any consent to their taking was vitiated. *Daniels v. State*, 718 S.W.2d 702, 707 (Tex. Cr.App.1986). These items should have been suppressed.

Turning to the *Franks v. Delaware* [3] issue, the majority faults appellant for failing to pass through all the procedural hoops necessary for an appellate determination of the merits of his claim. In this context I note only that at no point did the State complain of this defect, and that in fact in its brief to the court of appeals the State conceded that the motion to suppress hearing was conducted, in part, "to determine whether allegedly false statements, knowingly and intentionally or in reckless

disregard for the truth, were included in the affidavit, and if so, whether the false statements were necessary to the finding of probable cause." The court of appeals found that several subparagraphs of the affidavit were indeed "false," but, without passing on whether they were deliberately or recklessly so, held that even in their absence, the affidavit supplied probable cause. Appellant now maintains that without the allegedly infected subparagraphs, the affidavit is deficient. In reply, the State disputes this contention—and nothing more. That is the posture in which the case comes before us. That is the posture in which we should decide it.

For the foregoing reasons, I respectfully dissent.

TEAGUE and DUNCAN, JJ., join.

---

**3.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).