COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-097-CR

TRACEY ANN FRAME APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 4 OF TARRANT COUNTY

------------

MEMORANDUM 
OPINION
(footnote: 1)

------------

I. Introduction

In four issues, Appellant Tracey Ann Frame appeals the trial court’s decision to admit into evidence her videotaped statement to police and the sufficiency of the evidence to support her conviction for murder.  We affirm.  

II. Background Facts

The decedent, David Nixon, and Frame lived together for approximately three years in Grapevine, Texas.  By April 2002, the couple had begun to experience problems in their relationship, and on April 9, 2002, the Grapevine Police were called to their residence for a domestic disturbance.  On April 22, 2002, Nixon’s burning body was found near a Grand Prairie industrial park.  A missing-person report had been filed by one of Nixon’s ex-wives, Donna Lella, when their son had not heard from Nixon after his baseball game.  The medical examiner testified that Nixon’s body was burned postmortem and identified the cause of death as a single gunshot wound to the torso.  Nixon’s son testified that his father kept a handgun in the safe at his home.  However, no gun or bullet was ever recovered.
(footnote: 2)
 The State presented a great deal of circumstantial evidence against Frame at trial.  Frame did not testify at either the guilt/innocence or punishment phases.  However, Frame’s out-of-court statements were entered into evidence through the testimony of multiple witnesses and the videotaped statement she made to police.
(footnote: 3)  

Frame made inconsistent statements about Nixon’s whereabouts shortly before his body was discovered.  She recounted three different stories to three people.  She told Lella that Nixon had gone on vacation.  She told Gary Yarbrough, the managing director of Nixon’s real estate office, that she had no idea where Nixon was.  Lastly, she told Detective Darcey Sutton that Nixon had moved out and was working out of state.

There was evidence that a few months before the murder Frame had an abortion because Nixon expressed displeasure in having another child.  Frame claimed Nixon had “talked her into” having the abortion.  Specifically, she stated that Nixon told her if she carried the child to term she would end up like anybody else “living in an apartment and driving a Honda.”  However, Frame told police she had a miscarriage because Nixon had pushed her.  She also told friend Carol Davis that she had a miscarriage, but later admitted that she had an abortion.  Frame’s day planner, which was admitted at trial, details her experience of having the abortion and her regret and self-hatred for having done so.  There was also evidence that Nixon was making preparations to leave Frame.  In March and April 2002, Nixon purchased a large amount of furniture and had it delivered to a house he was leasing in Southlake.  Moreover, Nixon paid cash for the furniture and was attempting to keep the purchase and delivery secret.

Frame rented a Penske truck, dollies, and a hand truck
(footnote: 4) around the time of the murder.  Frame told police that she had rented the truck at Nixon’s request so he could move some of his larger items.  She also claimed to police and Davis that she had used the truck to take some lawn chairs to Goodwill. However, after Nixon’s body was discovered, Davis was visiting Frame and noticed the same furniture in the lawn that had always been there.  Moreover, Detective Todd Karfs checked the local Goodwill stores and confirmed that they had no record of Frame donating anything.  Guinevere Edwards, who leased the truck to Frame, testified that Frame left Nixon’s white Lexus at the store while she leased the truck.  Nixon’s friend John Hartenbower testified that he never once saw Frame drive Nixon’s car.

Davis testified that when Frame learned of Nixon’s death she was not distraught, and Davis found her reaction inappropriate.  Furthermore, a nail technician who went to lunch with Frame during this time testified that Nixon’s disappearance never came up during their conversation. 

Someone matching Frame’s general description was captured on a supermarket’s surveillance tapes entering the store on April 21, 2002.
(footnote: 5)  Around that same time a supermarket rewards card registered to “Tracey Ann Frame” was used to purchase several items including muriatic acid.  A worker at a janitorial supply company testified that he had told Frame on April 20 that muriatic acid would remove blood stains.  She had claimed she needed the product because her son had cleaned fish and had gotten blood somewhere inside or outside of the house.  Frame also purchased several other disinfectant cleaners from the janitorial supply company.
(footnote: 6)
 A cadaver-dog handler testified that his dog alerted on the trunk of Frame’s black Lexus and on the recliner from Frame and Nixon’s home.  The handler also testified that his dog could not alert to human decomposition of a specific person.  There was testimony suggesting that Nixon and Frame’s mattress had been replaced.  Nixon’s ex-wife Lisa Hemby
(footnote: 7) testified that the mattress depicted in police photographs was not the original mattress and that Nixon would have been unwilling to sleep on the mattress in the pictures.  Moreover, detective Larry Hallmark testified that the mattress and box spring did not match.

Before Nixon’s body was set ablaze, it was apparently wrapped in an electric blanket because the wires from the blanket were still discernible on his remains.  Police recovered a control device for an electrical blanket from Frame and Nixon’s bedroom but found no electric blankets in the residence.  However, the blanket found on Nixon’s body and the control device from the residence were never tested to see if they matched.

At trial, Frame suggested and put forth numerous alternative theories.  Frame claimed that both of Nixon’s ex-wives had motives to want him dead.  Particularly, Frame contended that Lella, Nixon’s first wife, had financial reasons to want Nixon dead.  Two weeks prior to his murder, Nixon had notified Lella that he was taking out a life insurance policy with their son as beneficiary and her as cobeneficiary.  Lella estimated this policy to be worth several million dollars.  Furthermore, Yarbrough testified that after Nixon’s death, he went to Lella’s house to plan Nixon’s eulogy and witnessed “a shouting match” between Lella and her parents.  They were arguing whether they should buy a new car or house with the insurance money or wait for things to settle down.  Lella denied this argument took place.  Lastly, in February 2002 Nixon had executed a holographic will that left all of his estate to his and Lella’s minor son.

Hemby, Nixon’s second wife, testified that she and Nixon had a rough divorce and admitted that he had obtained a temporary protective order against her.  Hemby invoked her Fifth Amendment rights when questioned about her past threats to Nixon.  There was also evidence that another body with similar signatures was found in the same industrial park one hundred yards from Nixon’s body.  Both bodies were wrapped in tarps and burned.
(footnote: 8)  Lastly, there was evidence that Nixon had $20,000 on his person just prior to being murdered that was never recovered. 

Frame further asserted that there was no physical evidence linking her to the murder.  All luminal tests were negative and no evidence was presented that indicated muriatic acid or any other cleaner was used on a tested surface. 

The jury found Frame guilty of murder and assessed punishment at forty years’ confinement.

III. Frame’s Statement to Police

In her first issue, Frame complains that the trial court should have suppressed her statement made to police because it resulted from an uncounseled, unwarned, custodial interrogation.  In her second issue, Frame asserts that her statement should have been suppressed because it was involuntary due to promise or reward.  

A. Circumstances of the Statement

After Nixon’s body was found, detectives invited Frame to the Grand Prairie police station for an interview.  Frame’s parents drove her to the police station.  Once she arrived she was taken to a restricted area of the police station and into an interrogation room.  The videotape reveals that no 
Miranda 
warnings were ever given and that at no time was she told she could terminate the interview or that she was free to leave.

The detectives proceeded to question Frame about the circumstances surrounding Nixon’s disappearance and death.  During the interview, Frame made numerous statements that were contradicted at trial by other witnesses’ statements and later testimony.  However, Frame never confessed to murdering Nixon.  At one point during the interview, the detectives were walking out of the interrogation room and Frame asked if her parents could come back to the room.  One of the detectives replied, “Not right now.  Sit tight for a few minutes.”  Later on Frame was asked where she planned on going after she left the police station and was given one of the detective’s cards and asked if she would contact him the following day after she had gotten some rest.  Thereafter, Frame left with her parents. 

The trial court overruled Frame’s motion to suppress the videotape and admitted the tape in its entirety.

B. Motion to Suppress 

We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court’s decision, we do not engage in our own factual review.  
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); 
State v. Ballard
, 987 S.W.2d 889, 891 (Tex. Crim. App. 1999).  Therefore, we give almost total deference to the trial court’s rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.  
Montanez v. State
, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); 
Johnson v. State
, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); 
State v. Ballman
, 157 S.W.3d 65, 68 (Tex. App.—Fort Worth 2004, pet. ref’d).  But when the trial court’s rulings do not turn on the credibility and demeanor of the witnesses, we review de novo a trial court’s rulings on mixed questions of law and fact.  
Estrada v. State
, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); 
Johnson
, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court’s ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court’s ruling.  
Kelly v. State
, No. PD-1136-05, 2006 WL 3019246, at *8 (Tex. Crim. App. Oct. 25, 2006).  When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court’s ruling, supports those fact findings.  
Id
.  We then review the trial court’s legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling.  
Id
.

When the record is silent on the reasons for the trial court’s ruling, or when there are no explicit fact findings and neither party timely requested findings and conclusions from the trial court, we imply the necessary fact findings that would support the trial court’s ruling if the evidence, viewed in the light most favorable to the trial court’s ruling, supports those findings.  
Id
.  We then review the trial court’s legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling.  
Id
.

We must uphold the trial court’s ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling.  
Armendariz v. State
, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), 
cert. denied
, 541 U.S. 974 (2004); 
Ross
, 32 S.W.3d at 856; 
Romero
, 800 S.W.2d at 543.  

C. Custody

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. 
 Miranda v. Arizona,
 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966). If an investigation is not at an accusatorial or custodial stage, a person’s Fifth Amendment rights have not yet come into play, and the voluntariness of those rights is not implicated.  
Melton v. State,
 790 S.W.2d 322, 326 (Tex. Crim. App. 1990).

 
The determination of custody must be made on an ad hoc basis, after considering all of the objective circumstances.  
Dowthitt v. State
, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996).  Stationhouse questioning does not, in and of itself, constitute custody.  
California v. Beheler
, 463 U.S. 1121, 1124–25, 103 S. Ct. 3517, 3519–20 (1983); 
Oregon v. Mathiason
, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977); 
Dancy v. State
, 728 S.W.2d 772, 778 (Tex. Crim. App.), 
cert. denied
, 484 U.S. 975 (1987).

Four factors are relevant to determining whether a person is in custody: (1) probable cause to arrest, (2) subjective intent of the police, (3) focus of the investigation, and (4) subjective belief of the defendant.  
Dowthitt,
 931 S.W.2d at 254. Under 
Stansbury v. California,
 factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of police officers; the custody determination is based entirely upon objective circumstances.  
Stansbury v. California,
 511 U.S. 318, 322–23, 114 S. Ct. 1526, 1528–29 (1994
); 
Dowthitt,
 931 S.W.2d at 254
.  Becoming the focus of the investigation does not equate to custody for purposes of determining whether a statement is voluntarily given.  
Meek v. State,
 
790 S.W.2d 618, 621 (Tex. Crim. App. 1990).

As a general rule, when a person voluntarily accompanies law enforcement to a certain location, even though she knows or should know that law enforcement suspects that she may have committed or may be implicated in committing a crime, that person is not restrained or “in custody.”
 
 Livingston v. State,
 739 S.W.2d 311, 327 (Tex. Crim. App. 1987), 
cert. denied,
 
487 U.S. 1210 (1988).  More specifically, so long as the circumstances show that a person is acting only upon the invitation, request, or even urging of law enforcement, and there are no threats, either express or implied, that she will be taken forcibly, the accompaniment is voluntary, and such person is not in custody.  
Anderson v. State,
 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), 
cert. denied,
 
521 U.S. 1122 (1997). However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. 
 Ussery v. State,
 651 S.W.2d 767, 770 (Tex. Crim. App. 1983)
.

The Texas Court of Criminal Appeals has outlined at least four general situations which may constitute custody:  (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that she cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest
(footnote: 9) and law enforcement officers do not tell the suspect that she is free to leave.  
Dowthitt
, 931 S.W.2d at 255.

Stansbury
 
indicates that in the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention
.
  
Id.
  
Concerning the fourth situation, the officers’ knowledge of probable cause must be manifested to the subject, and such manifestation could occur if information sustaining the probable cause is related by the officers to the suspect or by the suspect to the officers.
  
Id.
  

Here, the circumstances show that Frame was acting upon the detectives’ invitation when she voluntarily went to the police station to discuss Nixon’s disappearance and death.  
See
 
Anderson,
 932 S.W.2d at 505; 
 Livingston,
 739 S.W.2d at 327.  Moreover, even though the interview was conducted at the police station, that, in and of itself, did not constitute custody.  
See Beheler
, 463 U.S. at 1124–25, 103 S. Ct. at 3519–20; 
Mathiason
, 429 U.S. at 495, 97 S. Ct. at 714; 
Dancy
, 728 S.W.2d at 778.  Likewise, even though Frame became the focus of the investigation, this does not equate to custody for purposes of determining whether her statement was voluntarily given.  
Meek,
 
790 S.W.2d at 621.      

During the suppression hearing Frame admitted that she knew she had not been formally arrested and was uncertain if she had ever thought about leaving the interrogation room.  Being told to “sit tight for a few minutes”
 did not deprive Frame of her freedom of action in a significant way.  
See Dowthitt
, 931 S.W.2d at 255.  Furthermore, asking if her parents could come into the interrogation room is not the same as asking to leave.  
See id.  
It is true that Frame was never told she could leave and testified at the hearing that she did not feel that she could refuse to talk to the detectives.  However, it cannot be said that the detectives created a situation that would lead a reasonable person to believe that her freedom of movement had been significantly restricted.  
See id.
  Finally, Frame was allowed to leave the police station once she had given the detectives her statement.  Under these facts we are unable to conclude that the restriction of Frame’s freedom of movement amounted to the degree associated with an arrest as opposed to an investigative detention.  
See id. 

Therefore, we hold that Frame was not in custody at the time her statement was given to police.  Because she was not in custody, her Fifth Amendment rights had not yet come into play and the
 voluntariness of her statement is not implicated.  
Melton,
 790 S.W.2d at 326.  Accordingly, we 
uphold the trial court’s ruling because it is supported by the record and correct under the law applicable to this case.  
See Armendariz
, 123 S.W.3d at 404; 
Ross
, 32 S.W.3d at 856; 
Romero
, 800 S.W.2d at 543.  We overrule 
Frame’s first issue.   
 

D. Promise of Benefit or Reward 

If a promise made by a person in authority induced a confession, then that confession is inadmissible.  
Penry v. 
State, 903 S.W.2d 715, 748 (Tex. Crim. App. 1995); 
Alvarez
 
v. State
, 649 S.W.2d 613, 620 (Tex. Crim. App. 1982), 
cert. denied
, 464 U.S. 849 (1983).  Generally, the determination of the voluntariness of the confession depends on the totality of the circumstances surrounding the confession.  
Alvarez
, 649 S.W.2d at 620.
  However, before a promise will render a confession inadmissible, the promise must be shown to have induced the confession because it was positive for the defendant, made or sanctioned by someone in authority, and of such an influential nature that appellant might speak untruthfully in response.  
Muniz v. State
, 851 S.W.2d 238, 254 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 837 (1993).  In our review, we look to whether the circumstances of the promise would reasonably induce a defendant to admit to a crime he did not commit.  
Sossamon v. State
, 816 S.W.2d 340, 345 (Tex. Crim. App. 1991).

Frame argues that several comments and lines of questioning made by the detectives during the interview rise to the level of promises.  During the interview, the detectives made several references to abuse that Frame may have suffered at the hands of Nixon.  The detectives went as far as to say they knew she had been abused and that concerned them because they dealt with that sort of thing all the time in their jobs as detectives.  Finally, they told Frame that she was going to have to help herself if they were going to help her.

We can discern no logical manner in which the above-recited statements could be construed as promises of benefit or reward.  More importantly, because Frame never actually confessed to any crime, she has failed to show that the alleged promises reasonably induced her to admit to a crime she did not commit. 
 Id
.  Based upon the totality of the circumstances surrounding Frame’s statement
 we determine that her statement was voluntary and not the product of a promise of benefit or reward.  
See Alvarez
, 649 S.W.2d at 620.  
Accordingly we 
uphold the trial court’s ruling because it is supported by the record and correct under the applicable law.  
Armendariz
, 123 S.W.3d at 404; 
Ross
, 32 S.W.3d at 856; 
Romero
, 800 S.W.2d at 543.  We overrule 
Frame’s second issue.  

IV. Sufficiency of the Evidence

In her third and fourth issues, Frame contends that the evidence was legally and factually insufficient to support her conviction.

A. Standards of Review

 
In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).
  
The standard of review is the same for direct and circumstantial evidence cases.  
Burden v. State
, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001); 
Kutzner v. State
, 994 S.W.2d 180, 184 (Tex. Crim. App. 1999).

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 415 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 416–17; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict.  
Watson
, 204 S.W.3d at 417
.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn the conviction.” 
 Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”  
Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground.  
Goodman v. State
, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); 
Johnson
, 23 S.W.3d at 7.

B. Application 

As detailed above, the State presented a great deal of evidence against Frame at trial.  Our
 review of the evidence in the light most favorable to the verdict indicates that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt.  
See Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton
, 165 S.W.3d at 693.
  Although there was arguably some conflicting evidence, we are not allowed to re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder.  
Dewberry
, 4 S.W.3d at 740.  Furthermore, we are required to resolve any inconsistencies in the evidence in favor of the verdict.  
Curry
, 30 S.W.3d at 406.  Therefore, we hold there was legally sufficient evidence to support Frame’s conviction.  Frame’s third issue is overruled.  

Likewise after our review of all the evidence in a neutral light, favoring neither party, we conclude that the evidence supporting Frame’s conviction is also factually sufficient.  
Watson
, 204 S.W.3d at 417
; 
Drichas
, 175 S.W.3d at 799.  

The State presented Frame’s numerous inconsistent statements, unexplained suspicious behavior, and the circumstances of her failing relationship with Nixon as evidence supporting conviction.  Similarly, Frame presented evidence that contradicted the State’s evidence.  Specifically, Frame pointed to the lack of physical and forensic evidence tying her to Nixon’s murder and even proffered the possibility that others had a reason to want Nixon dead.  The jury agreed with the State.
  

We may not simply substitute our judgment for the jury’s.  
Johnson
, 23 S.W.3d at 12; 
Cain
, 958 S.W.2d at 407.  Under these facts the record does not clearly reveal that a different result was appropriate, and therefore we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”  
Johnson
, 23 S.W.3d at 8.

Therefore, we hold 
the evidence supporting Frame’s conviction was not so weak that the jury’s determination was clearly wrong and manifestly unjust.  Moreover, we also hold that the conflicting evidence did not so greatly outweigh the evidence supporting her conviction that the jury’s determination was manifestly unjust.  
See Watson
, 204 S.W.3d at 416–17
; 
Johnson
, 23 S.W.3d at 11.  We overrule Frame’s fourth issue.    

V. Conclusion

Having overruled Frame’s four issues, we affirm the trial court’s judgment.  

BOB MCCOY

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: December 14, 2006

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
The medical examiner testified that the bullet was not recovered because it was either lost during transport of the decomposed body or had exited the body and the exit wound was destroyed by the postmortem fire.

3:
The facts and circumstances of the videotaped statement are discussed in section III.A. of this opinion.  

4:
There was testimony that a hand truck is “an appliance.  You can move a refrigerator with it.”

5:
The quality of the video was too poor for a positive identification.  

6:
Frame purchased Tile and Stone cleaner, Lysol Kitchen cleaner, Lemon Extra, X-14, Fresh and Clean, and Kil’z Odor.

7:
Hemby had lived in the same house and slept on the same bed when she and Nixon were married.

8:
The medical examiner testified that Nixon’s body was wrapped in an electrical blanket and that there were fragments of burned plastic tarp stuck to the body.

9:
Probable cause to arrest exists when, at that moment, the facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information would warrant a reasonable and prudent man in believing that a particular person has committed or is committing a crime.  
 
Jones v. State,
 
493 S.W.2d 933, 935 (Tex. Crim. App. 1973).